EXHIBIT A
STATEMENT OF UNCONTESTED FACTS

1.    Barbara Bandurski and Walter Bandurski each owned 40-percent of the stock in Walter Bandurski, Inc. ("WBI"), a waste hauling business.  Their son, Michael, owned the remaining 20-percent of WBI.

2.    In July 1997, WBI transferred substantially all of its assets to Waste Management, Inc. in a tax-free, stock-for-assets merger.

3.    In August 1997, WBI distributed the Waste Management stock and WBI's remaining assets to Walter, Barbara, and Michael Bandurski in exchange for their stock in WBI. WBI's stock was cancelled and WBI ceased all activity.

4.    On May 21, 1998, a class action suit was filed in the United States District Court for the District of Delaware against the Delaware Solid Waste Management Authority by Sylvester Jenifer, t/a Vernon's Home Improvements.

5.    On June 30, 1998, WBI was dissolved under state law.

6.    Barbara Bandurski died on August 7, 1998.

7.    Walter Bandurski died on August 26, 1998.

8.    On October 2, 1998, a second class action suit was filed in the United States District Court for the District of Delaware against the Delaware Solid Waste Management Authority by several plaintiffs, including WBI.

9.    On January 2, 1999, the two class action suits against the Delaware Solid Waste Management Authority were consolidated.

10.    In May 1999, both the Estate of Barbara Bandurski and the Estate of Walter Bandurski made estimated Federal Estate Tax payments and filed extensions for time to file their Federal estate tax returns.

11.    Both estates filed their Federal estate tax returns by the end of 1999.

12.    In June 2000, WBI received $900,000.00 as its share of the settlement of the consolidated class action lawsuits.

13.    Because Barbara and Walter each owned 40-percent of WBI, each estate received 40-percent of the proceeds, or $360,000.00.

14.    The Internal Revenue Service audited both estates' tax returns, and determined that the estates should have included the settlement as an asset of the estate.  The IRS put the value of the asset at $318,773.00:  $360,000 less a discount for time between the time of the decedents' deaths in August 1998 and the time the estates received the money.

15.    On July 15, 2002, the Internal Revenue Service made assessments against each estate for additional taxes based, in part, on the settlement proceeds each estate had received.

16.    Both estates paid the additional tax and filed claims for refund.

17.    The Internal Revenue Service denied the claims for refund.

EXHIBIT B
CONTESTED ISSUES OF FACT AND LAW

Plaintiffs' Statement:

1.     What was the fair market value of the unknown claims to the plaintiff estates as of the dates of death in August, 1998?

2.     Whether fair market value must be assessed based upon what a willing buyer would have paid a willing seller assuming what was known as of the dates of death for the unknown claims.

3.     The extent to which after-acquired knowledge may be considered in arriving at the fair market value of the unknown claims.

4.     Whether the unknown claims had any material value as of the dates of death.

5.     Whether the untimely identified opinions of defendant's expert, Theodore J. Macierowski are admissible.

Defendant's Statement:

1.     What was the value of the litigation claim on August 7, 1998, the date of Barbara A. Bandurski's death?

2.     What was the value of the litigation claim on August 26, 1998, the date of Walter S. Bandurski's death?

3.     Is recovery of payments made by the estate of Barbara A. Bandurski prior to August 2, 2002, barred by the statute of limitations?

EXHIBIT C
LIST OF EXHIBITS

1.    The following exhibits were offered by plaintiff, received in evidence and marked as indicated:

    None.

2.    The following exhibits were offered by plaintiff and marked for identification.

    Defendant objected to their receipt in evidence on the grounds stated:

| No.: | Exhibit: | Defendant's Objection: | Plaintiffs' Response: |
|---|---|---|---|
| PX1 | Resume of Michael P. Kelly, Esq. | Hearsay (Fed. R. Evid. 801, 802). | The document was prepared by and will be authenticated by the witness and is not hearsay. |
| PX2 | Resume of Frederic Etskovitz, C.P.A. | Hearsay (Fed. R. Evid. 801, 802). | The document was prepared by and will be authenticated by the witness and is not hearsay. |
| PX3 | Agreement and Plan of Reorganization, dated July 31, 1997, by Walter S, Bandurski, Inc, Walter S. Bandurski, Barbara A. Bandurski and Michael J. Bandurski. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
| PX4 | Statement of Purposes and Transactions of the Agreement and Plan of Reorganization by Walter S. Bandurski, Inc. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
| PX5 | Exhibit C to1997 Corporation Income Tax Return for Walter S. Bandurski, Inc. (Form 1120). | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |

| PX6 | Statement of Stock Received in the Exchange Effectuated Pursuant to the Plan of Reorganization. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
|---|---|---|---|
| PX7 | Exhibit E to 1997 Corporation Tax Return of Walter S. Bandurski, Inc. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402) cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
| PX8 | WSB, Inc. Final Reconciliation. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
| PX9 | Certificate of Dissolution - Walter S. Bandurski, Inc. | Hearsay (Fed. R. Evid. 801, 802), relevance (Fed. R. Evid. 401, 402), cumulative in that it goes to facts which have been stipulated (Fed. R. Evid. 403). | The document will be authenticated by James DallePazze, Esq., the attorney for WBI and the document is evidence of the lack of knowledge of the existence or value of the unknown claim. |
| PX10 | Time Line of Events | Defendant objects to the "Early 2000" entry on this exhibit on the grounds of relevance (Fed. R. Evid. 401, 402); defendant would not object to admission of this exhibit if this entry were removed. | The sequence of events will be the subject of testimony at trial and is relevant to the knowledge of and potential value of the unknown claim. |

3.    The following exhibits were offered by defendant, received in evidence and marked as indicated.

DX101:    Certified Transcript of Account Under Seal, Barbara A. Bandurski Estate (dated June 3, 2005.)

919 Market Street, Suite 1800    Phone: 302-984-6301
P. O. Box 111                    Fax:   302-984-6399
Wilmington, DE 19899            E-Mail: MKelly@mccarter.com

# Michael P. Kelly

**EDUCATION:**

| | |
|---|---|
| Law School: | THE DICKINSON SCHOOL OF LAW, Carlisle, PA |
| | J.D., 1983 |
| | G.P.A. 81.01 |
| | Activities:   Elected President of the Student Body |
| | Corpus Juris Society |
| | Social Committee |
| | Dickinson College Boxing Team |
| College: | COLUMBIA COLLEGE, New York, NY |
| | B.A. English, 1979 G.P.A.—3.37 |
| | Activities:   Varsity Football – 3 years |
| | Varsity Track – 4 years (Captain – Senior Year) |
| | Writer for School Daily Newspaper |
| | Honors:   Dean's List Every Year |
| | Gustave Jaeger Prize for Athletics |
| | Selected as speaker at Columbia Sports Banquet |
| | One of two students appointed to Trustee Committee |

**EMPLOYMENT:**

June 1, 2000-Present   MCCARTER & ENGLISH, Managing Partner of
Wilmington Office; Member of Firm's Executive
Committee Specializes in complex, environmental ,corporate,
and commercial litigation. Active trial practice
throughout the U.S.----national counsel for numerous corporate
clients.  Presently Outside General Counsel for Stauffer
Management Company LLC.

April, 1999 –
June, 2000     MICHAEL P. KELLY, P.A., Wilmington, DE
Trial attorney, litigation in all Delaware Courts.  Specialized in
complex litigation, personal injury and environmental litigation.
Extensive practice in corporate and commercial litigation, as well
as criminal law and bankruptcy.

May, 1992 –
April, 1999    HAASE & KELLY, Partner, Wilmington, DE
Trial attorney.  Handled litigation in all Delaware Courts, and
specialized in person injury and environmental litigation. Tried
cases in numerous jurisdictions throughout the country. Also
handled commercial transactions.

January 1, 1991 –
May, 1992      MICHAEL P. KELLY, P.A., Wilmington, DE
Trial attorney. General practice.



EXHIBIT
PLAINTIFFS
ME 19464123

| March, 1987 –<br>December 31, 1990 | HERCULES INCORPORATED, Wilmington, DE<br>Employed as Counsel and Chief Environmental Counsel. Personally handled environmental litigation involving the Company: Superfund, RCRA, Clean Water Act, etc. Also represented the Company in custom/duty litigation and in litigation filed locally, and handled broad variety of commercial transaction as well.  In 1990 received Hercules-Aqualon Triangle Achievement Award. |
|---|---|
| 1983-1987 | PRICKETT, JONES, ELLIOTT , KRISTOL & SCHNEE<br>Employed as trial attorney.  Appeared in all Delaware Courts, Jury trials in Delaware Superior and U.S. District Courts. Argued six cases before the Delaware Supreme Court before 30th birthday. |
| Summer '82 | PUBLIC DEFENDER'S OFFICE, Wilmington, DE<br>Employed in Appellate Division.  Researched legal issues in criminal matters on appeal to the Delaware Supreme Court and the U.S. Supreme Court. |
| January, 1980 –<br>April, 1980 | NEW CASTLE COUNTY SCHOOL DISTRICT AREA II<br>Served as a substitute teacher for high schools 5 days/wk. |

OTHER POSITIONS:

Chairman, New Castle County Zoning Board of Adjustment
1989 – 1995

Member of Board of Managers, Central Branch YMCA
1990 - 1992

Treasurer, Delaware State Bar Association
1992 - 1994

Adjunct Professor of Law, Widener University
School of Paralegal Studies.

Admitted to Bars of Delaware, Pennsylvania,
U.S. District of Delaware, and U.S. Third Circuit.

Board of Directors, Delaware Council on Crime and Justice

Delaware Volunteer Legal Services.

Executive Committee, St. Thomas More Society

Lector – St. Ann's Church

Member – Wilmington Rotary  Club

Board of Trustees, Tower Hill School

Defense Counsel of Delaware, Founding Member

Member, Delaware Trial Lawyers Association

Rodney Inns of Court

Board of Directors, Police Athletic League of Delaware, Inc.

PUBLICATIONS AND PROGRAMS:

Speaker, Delaware Trial Lawyers Association Convention 1989 – "Underinsured Motorist Insurance";

1990 Defense Counsel of Delaware Seminar – "Medico-Legal Issues"

1990 Defense Counsel of Delaware – "Arbitrating the Injury Case in Delaware"

1993 Speaker – "Land Use Issues – Delaware" NBI

June 1996 Delaware Trial Lawyers Association Convention – "The Orthopedist and the Lawyer"

November 1998 – "Trying the Automobile Injury Case in Delaware"  NBI

October 1999, Speaker – "How to Litigate Your First Civil Trial in Delaware"  NBI

June 2000 - Delaware Trial Lawyers Association Annual Convention – "Tips for Successful Arbitration and Mediation"

April 24, 2001 – "Trying the Automobile Injury Case in Delaware" NBI

April 27, 2001 – Delaware Trial Lawyers Association Spring Seminar, "Presenting Rule 16.1 Arbitrations"

Testifying Expert Witness in Legal Malpractice Litigation (Del. Super Ct.—Dec. 1999)

November 14, 2001 – "What's Happening in Delaware ADR and How It Affects Your Practice"

January 22, 2002 – "Keys to Successful Pre-Trial Preparation in Delaware"

February 22, 2002  - "What's Hot in Civil Litigation"

September 18, 2002 – "How to Successfully Make and Manage Objections at Trial"

January 23, 2003 – "Trying the Injury Case"

May 16, 2003 – "Taking and Defending Effective Depositions in Delaware"

February 4, 2004 – "Trying the Injury Case in Delaware"

May 25, 2004 - "Taking and Defending Effective Depositions in Delaware"

November 5, 2004 – "Keys to Successful Pre-Trial Preparation in Delaware"

June 22, 2005 – "Taking and Defending Effective Depositions in Delaware"

Summer Issue, 2005 *Delaware Lawyer* – "Humor in the Courtroom"

October 10, 2005 - "How to Successfully Make and Manage Objections at Trial"

NOTABLE QUOTES AND INTERVIEWS:

November 6, 2003 – *Bloomberg News*, re Daimler Chrysler

November 20, 2003 – *The News Journal*, re <u>Eric May v. Michael Hershey</u>

November 23, 2003 – *The News Journal*, re <u>Eric May v. Wilmington Trust</u>

December 1, 2003 – *Bloomberg Radio*, re Daimler Chrysler

December 4, 2003 – *The Post-Standard,* re Skaneateles Falls

June 24, 2004 – *Bloomberg News*, re Michael Hershey's  Wachovia Corp. shares

October 11, 2004 – *Barron's* re SEC v. Michael Hershey

February 18, 2005 – *The Citizen*, re Taylor Road residents

May 13, 2005 – *Los Angeles Daily News*, re Disney Board of Directors

May 18, 2005 – *Business Wire*, re Audivox Victory

May 23, 2005 – *BNA's Securities Regulation & Law Report*, re Audiovox interview

July 6, 2005 – *Delaware Corporate Litigation Reporter*, re Audiovox

July 11, 2005 – *Bloomberg News*, re Vioxx

August 9, 2005 – *Bloomberg National Radio*, re Disney Directors

August 14, 2005 – *The News Journal*, re Disney Trial

August 22, 2005 – *Kansas City Star*, re H&R Block shares

August 22, 2005 – *Bloomberg News*, re Vioxx

August 23, 2005 – *Montreal Gazette*, re Vioxx

August 23, 2005 – *Belfast Telegraph*, re Vioxx

August 23, 2005 – *The Independent*, re Vioxx

August 23, 2005 – *National Post*, re Vioxx

August 26, 2005 – *Bloomberg Radio*, re Vioxx

September 19, 2005 – *Bloomberg TV*, re Dennis Kozlowski

October 16, 2005 – *The New Journal*, re Disney Trial

November 2, 2005 – *Delaware Law Weekly*, Jane Brady

November 3, 2005 – *Bloomberg Radio*, re Vioxx

November 9, 2005 – *Delaware Law Weekly*, Audiovox Ruling

November 16, 2005 – *Bloomberg Radio*, re Vioxx

November 16, 2005 – *Delaware Law Weekly*, Audiovox

November 17, 2005 – *Montreal Gazette*, re Vioxx

November 28, 2005 – *Bloomberg Radio*, live interview re pharmaceutical litigation

December 13, 2005 – *Bloomberg Radio*, live interview re Vioxx

January 19, 2006 – *Bloomberg News*, re Tom Capano

February 1, 2006 – *Sears, Roebuck & Co. v. Midcap*, re adverse-inference instruction

February 2, 2006 – *Daily Labor Report*, re Emory v. AstraZeneca

May 15, 2006 - *Corporate Officers and Directors Liability Litigation Reporter*, John P. Gallo v. Novavax.  "The ruling makes it crystal clear that the New Jersey courts will expect a director or officer to be fully knowledgeable about the company's policies and contracts, especially the ones they approved," Kelly said.

May 31, 2006 – *Corporate Officers and Directors Liability Litigation Reporter*, John P. Gallo v. Novavax.  Kelly said, "Opposing a skilled trial lawyer like [Edwin] Jacobs brought my game to a higher level."

July 13, 2006 – *Bloomberg News*, re Vioxx.

July 14, 2006 – *The Record (Bergen Co., NJ)*, re Vioxx.

July 14, 2006 – *Los Angeles Times* re Vioxx.  "If I were a plaintiffs' attorney sitting on the fence, I would certainly be daunted by this verdict," said Mike Kelly.

July 27, 2006 – *Philadelphia Business Journal* re Michael Hershey.  "Advisory, individuals, settle SEC case."

July 28, 2006 – *The News Journal* re Michael Hershey.  "Kennett Square investment manager pays duPont heir $250,000 penalty."

July 28, 2006 – *Philadelphia Inquirer* re Michael Hershey.  "Fund adviser settles case by paying estate."

August 7, 2006 – *Barron's*, re Hershey settlement.

August 18, 2006 – *Globe and Mail*, re "Quote of the Day" on Vioxx.

August 30, 2006 – *Bloomberg News*, re Vioxx.

September 15, 2006 – *Bloomberg News*, re Wyeth hormone.

**Fredric Etskovitz**
**Certified Public Accountant**
**607 Fulton Street**
**Philadelphia, PA 19147**

**Employment Experience:**

June, 2000
to current

Astea International Inc.

Chief financial officer and Treasurer of publicly traded (NASDAQ) software company

- Responsible for compliance with Securities and Exchange Commission requirements
- File annual and quarterly financial statements
- Primary liaison with independent accountants
- Report to chief executive officer and Audit Committee
- Manage accounting and financial operations of worldwide organization
- Primary responsibility for shareholder relations
- Assist with reorganization of company to reduce excess operating costs and increase operating efficiency in order to become profitable
- Numerous presentations to outside investors

January 1, 1995
to October, 2005

Shechtman, Marks, Devor & Etskovitz, P.C., Philadelphia, PA

Shareholder in firm of certified public accountants

- Compilation, review and audit of financial statements
- Consulting to public companies on compliance with Sarbanes-Oxley requirements
- Personal financial planning
- Tax planning for businesses and individuals
- Preparation of federal, state and local income tax returns
- Long and short-term planning for privately owned businesses
- Valuations of closely held businesses for buy/sell agreements, estate planning and minority interests
- Financial analysis of proposed business transactions, including start-ups, acquisitions, sales, asset purchases and financing alternatives
- Litigation support to attorneys for assistance in civil and commercial lawsuits involving valuations of losses, analysis of transactions, forensic accounting and other matters requiring knowledge of accounting and financial issues.

1987 to 1994

Heller, Etskovitz & Casterline, P.C., Norristown, Pa

Partner in firm of certified public accountants and management consultants

- Compilation, review and audit of financial statements
- Personal financial planning
- Tax planning for businesses and individuals
- Provide assistance to attorneys in support of litigation
- Preparation of federal, state and local income tax returns



- Long and short-term planning for privately owned businesses
- Financial analysis of proposed business transactions, including start-ups, acquisitions, sales, asset purchases and financing alternatives

1980 to 1986    E.I. DuPont de Nemours & Company, Inc., Wilmington, DE

Supervisor, Corporate Accounting, Finance Department

- Responsible for preparation of company's monthly, quarterly and annual consolidated financial statements

- Managed staff of accountants

1980 to 1986    E.I. DuPont de Nemours & Company, Inc., Wilmington, DE (continued)

Financial Analyst, Planning Studies

- Developed corporate guidelines for analysis of investment opportunities
- Performed various analyses on potential acquisitions, divestitures and corporate restructurings

Financial Analyst, Financial Projections

- Prepared short and long term projections of corporate earnings and cash flow used in strategic planning
- Recommended dividend policy to company's Board of Directors

Financial Analyst, Employee Benefits & Compensation

- Analyzed and negotiated medical and insurance contracts with various providers throughout U.S.

1976-1978    Laventhol & Horwath, Philadelphia, PA

Senior accountant

- Responsible for assisting in audits of publicly traded and privately owned businesses
- Prepared federal, state, and local income tax returns

**Education:**

Wharton Graduate School, University of Pennsylvania, Philadelphia, PA
Masters in Business Administration - 1980
Concentration in Finance and Insurance
Instructor of accounting in Wharton Undergraduate School

Pennsylvania State University, State College, PA
Bachelor of Science Degree - 1976
Major - Accounting

**Professional Societies:**

> American Institute of Certified Public Accountants
> Personal Financial Planning Division, AICPA
> Pennsylvania Institute of Certified Public Accountants

**Volunteer Organizations:**

> American Israel Chamber of Commerce, Philadelphia, PA
> - Treasurer and member of Executive Committee
>
> American Technion Society, Bala Cynwyd, PA
> - Board of Director member

# PURCHASE AND SALE OF ASSETS AGREEMENT

THIS PURCHASE AND SALE OF ASSETS AGREEMENT (the "Agreement") is executed and delivered as of July 31, 1997, between **USA WASTE OF DELAWARE, INC.**, a Delaware corporation ("Buyer"), and **WALTER S. BANDURSKI, INC.**, a Delaware corporation ("Seller"), and **WALTER S. BANDURSKI, BARBARA BANDURSKI**, and **MICHAEL BANDURSKI**, individually and as stockholders of Seller (collectively "Stockholders").

## P R E M I S E S:

**WHEREAS**, Seller operates a waste collection, transportation, recycling and disposal business located in the Wilmington, Delaware area (the "Business");

**WHEREAS**, Buyer desires to purchase and acquire certain assets, properties and contractual rights of Seller used in connection with the Business and Seller desires to sell such assets, properties and contractual rights to Buyer, all in accordance with the terms and conditions set forth in this Agreement;

**WHEREAS**, Stockholders hold all of the outstanding capital stock of Seller and Buyer is unwilling to enter into this Agreement without the covenants and promises of Stockholders herein set forth; and

**NOW, THEREFORE**, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, received to the full satisfaction of each of them, the parties hereby agree as follows:

## A G R E E M E N T

## ARTICLE 1. SALE OF ASSETS

**Section 1.1 Description of Assets**. Upon the terms and subject to the conditions set forth in this Agreement, Seller does hereby grant, convey, sell, transfer and assign to Buyer the following assets, properties and contractual rights of Seller, wherever located, subject to the exclusions hereinafter set forth:

(a)    all equipment used or for use in the operation of the Business, including, without limitation, the equipment listed on Schedule 1.1(a) attached hereto and made a part hereof (the "Equipment"),

(b)    all of the motor vehicles used or for use in the Business, and all attachments, accessories and materials handling equipment now located in or on such motor vehicles (the "Rolling Stock"), as the same are listed and more completely described by manufacturer, model number and model year on ~~ ~~ ~~ ~~ hereto and made a part hereof;

**EXHIBIT**
PLAINTIFFS
3

(c)    all radios located in the Rolling Stock, the radio base station and all routing and billing information, including all routing and billing software and programs (a working electronic copy of which shall be provided at Closing), each of which are listed on Schedule 1.1(c) attached hereto and made a part hereof;

(d)    immediate access during normal business hours to all computer equipment containing routing and billing software information, and physical possession and ownership of said computer equipment 180 days after Closing;

(e)    all contractual rights of Seller with Seller's customers (whether oral or in writing) relating to the conduct of the Business (the "Customer Accounts"), and all commitments, lists, leases, permits, licenses, consents, approvals, franchises and other documents relating to the Customer Accounts (the "Related Approvals"); a complete and accurate list of the Customer Accounts and the Related Approvals is set forth on Schedule 1.1(d), attached hereto and made a part hereof, and true and complete copies of all Customer Accounts and Related Approvals shall be delivered to Buyer simultaneously with the execution and delivery of this Agreement;

(f)    all of Seller's inventory of parts, tires and accessories of every kind, nature and description used or for use in connection with the Business (the "Inventory");

(g)    all right, title and interest of Seller in and to all trade secrets, proprietary rights, symbols, trademarks, service marks, logos and trade names used or for use in the Business;

(h)    all other permits, licenses, franchises, consents and other approvals relating to the Business (true and complete copies of which shall be delivered to Buyer simultaneously with the execution and delivery of this Agreement);

(i)    all right, title and interest of Seller in and to the telephone number (302) 654-8497, and all value enhanced services related to said telephone number used by Seller in the conduct of the Business;

(j)    all of Seller's existing documents, files and other material related to all current or past customers of the Business and/or the Assets (as herein after defined);

(k)    all of Seller's shop tools, nuts and bolts relating to the Business;

(l)    all recycling equipment used in the Business;

(m)    all right, title and interest in and to the use of the name "Walter S. Bandurski, Inc." and all trade names related thereto and the right to use such name for a period of three years; and

(n)     all of the goodwill of the Business.

All of the foregoing assets, properties and contractual rights are hereinafter sometimes collectively called the "Assets."

     **Section 1.2   Excluded Assets.**  The parties agree that there shall be excluded from the Assets the following, which are not being sold to Buyer pursuant to this Agreement (the "Excluded Assets"): (a) all cash on hand and on deposit of Seller, except as set forth in Section 1.5 hereof; (b) all accounts receivable of Seller ("Accounts Receivable") as of the close of business on the date of Closing (hereinafter defined); (c) all real property and all buildings on and fixtures to all real property of Seller (whether owned or leased); (d) all contracts and contract rights and obligations of Seller (whether oral or in writing) other than the Customer Accounts and Related Accounts and all commitments, lists, leases, permits, licenses, consents, approvals, franchises and other instruments not relating to the Customer Accounts or the Business; (e) all employment contracts to which Seller is a party or by which Seller is bound; (f) all motor vehicles of Seller that are not Rolling Stock; (g) the corporate record books and corporate seal of Seller; and (h) those items set forth on Schedule 1.2.

     **Section 1.3   Non-Assignment of Certain Customer Accounts.**  Notwithstanding anything to the contrary in this Agreement, to the extent that the assignment hereunder of any Customer Account shall require the consent of any third party, neither this Agreement nor any action taken pursuant to its provisions shall constitute an assignment or an agreement to assign if such assignment or attempted assignment would constitute a breach thereof or result in the loss or diminution thereof; provided, however, that in each such case, Seller and Stockholders shall use their best efforts to obtain the consent of such other party to such assignment to Buyer.  If such consent is not obtained, Seller and Stockholders shall cooperate with Buyer in any reasonable arrangement designed to provide for Buyer the benefits under any such Customer Account, including, without limitation, an adjustment of the purchase price set forth in Section 2.1 hereof and enforcement for the account and benefit of Buyer, of any and all rights of Seller or Stockholders against any other person arising out of the breach of cancellation of any such Customer Account by such other person, or otherwise.  Attached hereto as Schedule 1.3 is a list of all Customer Accounts which may require consent to their assignment.

     **Section 1.4   Seller Accounts Receivable.**  Buyer shall have no liability or obligation whatsoever to Seller in connection with Seller's Accounts Receivable and Buyer shall not be responsible for collecting Seller's Accounts Receivable.  However, Buyer will, in accordance with its standard collection practices, attempt to collect Seller's Accounts Receivable for a period of 120 days after the date of Closing (hereinafter defined).  In that regard, Buyer shall set up an account with Wilmington Trust Company into which all checks or other proceeds shall be placed that are received by either party after Closing and which relate to Seller's accounts receivable at the date of Closing.  Buyer agrees to apply said payments to the oldest balance unless: (1) the customer disputes the actual balance due, and/or (2) the customer specifically designates to what balance the monies should be applied.  In such an event, Buyer shall have no further responsibility for collecting said account and the parties agree that Seller

shall be entitled to pursue its own legal remedies against said customer. Buyer agrees to make disbursements out of said account on a weekly basis, dispersing to Seller all monies received for services occurring prior to and including the day of Closing. Any checks or other proceeds received in payment of accounts receivable due to Buyer for service occurring after Closing shall be dispersed to Buyer. Buyer shall maintain said account for six months after Closing at which time, Buyer shall close that account and distribute all monies to Seller which have been collected for services rendered prior to Closing. Thereafter, to the extent that a party receives monies that are owed in connection with service provided by the other party, Buyer and Seller both agree to disperse such funds in a manner that reflects the service rendered to the customer by the respective parties hereto. Attached hereto as Schedule 1.4 is a true and complete list of all accounts receivable of Seller as of July 31, 1997.

**Section 1.5    Proration of Cash on Hand**. The parties shall prorate, as of the close of business on the date of Closing, all cash on hand or on deposit with Seller consisting of sums paid to Seller pursuant to the advance billing practice of Seller or otherwise representing a prepayment to Seller of services to be rendered after the Closing. Seller shall be entitled to all such sums allocable to services performed on or before the close of business on the date of Closing and Buyer shall be entitled to all such sums allocable to services to be performed thereafter. Buyer and Seller agree that the amount of such prepaid services to be credited to Buyer is $62,000.

**Section 1.6    Change of Name**. On the date of Closing, Seller shall take all necessary action to change Seller's current Business Name, "Walter S. Bandurski, Inc." to a name not the same as or similar to Walker S. Bandurski, Inc. or any other symbol, trademark, service mark, logo or trade name now used by Seller. Seller shall, simultaneously with the execution and delivery of this Agreement, deliver to Buyer, in form suitable for filing, such certificates, consents and other documents as are necessary to effect the transfer of the registration of the Business Name conveyed by Buyer pursuant to this Agreement in each state where Seller has registered any such name under a "trade name" or "fictitious name" statute or similar law, and shall grant any consents and take any other and further action, all at Seller's own expense, requested by Buyer to enable Buyer to reserve or register any such name for use of Buyer.

## ARTICLE 2.   PURCHASE PRICE

**Section 2.1    Aggregate Purchase Price**. Subject to the conditions set forth below, at Closing Buyer shall pay to Seller for the Assets the total sum of FIVE MILLION DOLLARS ($5,000,000) payable as follows:

**Section 2.2    The number of shares of USA Waste stock to the nearest whole share necessary to equal $3,051,068.62 (which represents $3,675,000, less debt of Seller being assumed by Buyer of $561,931.38, minus the prepaid services to be credited to Buyer of $62,000), calculated using the average closing NYSE composite stock price for the five trading days prior to the five trading days prior to the closing shall be issued and delivered at Closing.

-4-

**Section 2.3**    Cash in the amount of $500,000 (Five Hundred Thousand Dollars) and other good and valuable consideration shall be paid to Seller and certain Stockholders as follows at Closing in accordance with the Noncompetition Agreements: $100,000 at Closing; $100,000 on the first, second, third and fourth anniversaries of Closing.

**Section 2.4  Holdback for Verification of Assets**.  Seller agrees that the number of shares of USA Waste stock equal to $825,000 (the "Holdback Funds"), calculated in accordance with Section 2.2 above, otherwise payable to Seller for the Assets on the date of Closing, shall be retained by Buyer until such time, not later than 180 days after Closing (the "Holdback Period"), that Buyer shall have been able to verify the existence and condition of the Assets and that the revenues of the Business and the debts of Seller relative to the Assets are as represented by Seller.  Buyer shall be entitled to commingle the Holdback Funds with its general accounts.  If Buyer discovers the absence or nonconforming condition of any of the Assets, or if Buyer discovers that the liabilities of Seller relative to the Business or the revenues generated by the Business are not as represented and disclosed by Seller in this Agreement, then Buyer shall be entitled to deduct an equitable amount from the Holdback Funds for each such absence, nonconforming condition or undisclosed liability or shortfall in revenue, in amount equal to $8.74 for every dollar of shortfall in average monthly revenue. Except as set forth below, upon the expiration of the 180-day period, all remaining Holdback Funds shall be delivered to Seller plus accrued simple interest thereon at the rate of 6.25% per annum.

In the event of a dispute between the parties as to the foregoing purchase price adjustment, the parties will have 30 days to resolve the dispute among themselves.  If the parties have not resolved such dispute within such 30-day period, then the parties shall will agree upon an arbitrator who shall decide the dispute within 30 days after his selection and the parties each agree to be bound by such decision.  If the parties cannot agree on an arbitrator, then Buyer and Seller will each select an arbitrator and the two arbitrators so selected shall select a third arbitrator.  The three arbitrators shall decide the dispute within 30 days after their selection and the parties hereto each agree to be bound by a decision of the majority of such arbitrators.  The arbitrators can be any natural person above the age of 18 and need not have any specific qualifications.  All costs of the arbitration shall be split equally between Buyer and Seller.

## ARTICLE 3.  CLOSING

**Section 3.1  Time and Place of Closing**.  Unless otherwise agreed to by the parties hereto, this transaction shall be closed within three business days after the completion, satisfaction or waiver of the conditions set forth in Articles 8 and 9 (the "Closing").  The Closing shall take place at a location mutually acceptable to Buyer and Seller.  The date on which the Closing occurs shall be referred to as the "Closing Date."

**Section 3.2  Deliveries by Seller and Stockholders**.  At the Closing, Seller and Stockholders shall deliver to Buyer, all duly executed:

(a) a General Conveyance, Assignment and Bill of Sale, in form and substance satisfactory to Buyer and Seller, conveying, selling, transferring and assigning to Buyer

all of the Assets (the "Bill of Sale");

     (b)    motor vehicle Certificates of Title and/or registrations to the Rolling Stock, properly endorsed to Buyer;

     (c)    a receipt acknowledging payment by Buyer of the purchase price;

     (d)    fully executed consents to the assignment of the Customer Accounts set forth on Schedule 1.3, if any, in form and substance satisfactory to Buyer;

     (e)    a certified copy of the resolutions of the stockholders and directors of Seller authorizing the execution of this Agreement, the sale of the Assets to Buyer, and the consummation of the transactions contemplated herein, along with an incumbency certificate of Seller; and

     (f)    such other separate instruments of sale, assignment or transfer reasonably required by Buyer.

     **Section 3.3  Deliveries by Buyer.**  At the Closing, Buyer shall deliver to Seller the Purchase Price set forth in Section 2.1.

## ARTICLE 4.   COVENANTS OF SELLER AND STOCKHOLDERS

     **Section 4.1  Use of Business Name.**  Seller and Stockholders covenant not to use the Business Name or any similar names from and after the close of business on the date of Closing.

     **Section 4.2  Transition.**  Neither Seller nor Stockholders will take any action that is designed or intended to have the effect of discouraging any customer or business associate of Seller from maintaining  the same business relationships with Buyer after the Closing that it maintained with Seller before the Closing.   Seller and Stockholders will refer all customer inquiries relating to the Business to Buyer from and after the Closing.   Further, Seller and Stockholders agree that for a period of 90 days following the date of Closing, they will, without additional consideration, assist Buyer with the orderly transition of the operations of the Business from Seller to Buyer, including without limitation, assisting Buyer with the assignment of Customer Accounts to Buyer, routing transition and developing sufficient customer information to enable Buyer to bill customers on an accurate basis.

     **Section 4.3  Survival.**  Each of the covenants set forth in this Article 4 shall survive the Closing and the transfer of the Assets.

## ARTICLE 5.   REPRESENTATIONS AND WARRANTIES OF SELLER AND STOCKHOLDERS

     **Section 5.1**  Seller and Stockholders, jointly and severally, represent and warrant

to Buyer that to the best of their knowledge:

      (a)    **Authority**.

      (i)  Seller is a corporation duly formed, validly existing and in good standing under the laws of the State of Delaware. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the compliance by Seller and Stockholders with the terms of this Agreement do not and will not conflict with or result in a breach of any terms of, or constitute a default under, the articles of incorporation or bylaws of Seller, or any instrument or other agreement to which Seller or Stockholders is a party or by which Seller or Stockholders is bound. This Agreement constitutes a valid obligation of Seller and Stockholders enforceable against Seller and Stockholders in accordance with its terms.

      (ii)  Stockholders are competent, under no duress or legal restraint, and have all necessary authority to enter into this Agreement, perform Stockholders' obligations hereunder and consummate the transactions contemplated hereby.

      (iii)  All of the issued and outstanding shares of Seller are owned of record and beneficially by Stockholders, free and clear of all liens, security interests and encumbrances whatsoever.

      (b)    **Compliance with Law**.  Neither Seller nor Stockholders is in default under any applicable federal, state or local laws, statutes, ordinances, permits, licenses, orders, approvals, variances, rules or regulations or judicial or administrative decisions ("Applicable Laws") which would have an adverse effect upon the Assets or the Business.  Seller has been granted all licenses, permits, consents, authorizations and approvals from federal, state and local government regulatory bodies necessary or desirable to carry on the Business, all of which are currently in full force and effect. Each of the Assets complies in all respects with all federal, state and local laws, statutes, ordinances, permits, licenses, approvals, rules and regulations applicable thereto.

      (c)    **Equipment**.  Listed on Schedule 1.1(a) hereto is a complete and accurate list of all Equipment used or for use in connection with the Business.  Each piece of Equipment is in good working order and repair.

      (d)    **Rolling Stock**.  Listed on Schedule 1.1(b) hereto is a complete and accurate list of all Rolling Stock.  Each motor vehicle, attachment, accessory and piece of materials handling equipment comprising the Rolling Stock is in good working order and repair, except as set forth on Schedule 1.1(a).

      (e)    **Customer Accounts**.  Listed on Schedule 1.1(d) hereto is a complete and accurate list of the Customer Accounts as of the date hereof.  Except as set forth on

-7-

Schedule 1.3, all Customer Accounts are (and will be immediately following the Closing) in full force and effect and are valid, binding and enforceable against the respective parties thereto in accordance with their respective provisions, and Seller is not in default in, nor has there occurred an event or condition (including Seller's execution and delivery of or performance under this Agreement) which with the passage of time or the giving of notice (or both) would constitute a default, with regard to the payment or performance of any obligation under any Customer Account; no claim of such a default has been asserted and there is no reasonable basis upon which such a claim could validly be made. Neither Seller nor Stockholders has received any notice that any person intends or desires to modify, waive, amend, rescind, release, cancel or terminate any Customer Account. By virtue of the grant, conveyance, sale, transfer and assignment of the Customer Accounts by Seller to Buyer hereunder, Buyer shall own and hold all rights, title and interest of Seller in and to the Customer Accounts, without the consent or approval of any other person or entity.

    (f)    <u>Title to the Assets</u>.

    (i) Seller has good and marketable title to the Assets, free and clear of all liens, lease payments (including lease end buy out payments), encumbrances, security interests, equities or restrictions whatsoever and, by virtue of the grant, conveyance, sale, transfer, and assignment of the Assets hereunder, Buyer shall receive good and marketable title to the Assets, free and clear of all liens, lease payments (including lease end buy out payments), encumbrances, security interests, equities or restrictions whatsoever. The Assets include all of the permits, licenses, franchises, consents and other approvals necessary or desirable to conduct the Business.

    (ii) All of the Assets are either owned by Seller or leased under a current written lease agreement set forth on Schedule 5.1(f). All such lease agreements are in full force and effect and constitute valid and binding agreements of the parties (and their successors) thereto in accordance with their respective terms. No default by Seller or, to the best of Seller's knowledge, any other party to any of such leases exists or would exist except for the passage of time or delivery of a notice or both.

    (g)  <u>Litigation</u>. Except as set forth on Schedule 5.1(g) hereof, there is no claim, litigation, action, suit or proceeding, whether administrative or judicial, pending or threatened against Seller or Stockholders, or involving the Assets or the Business, at law or in equity, before any federal, state or local court or regulatory agency, or other governmental authority. Neither Seller nor Stockholders has received any notice of any of the above and no facts or circumstances exist which would, with the passage of time or giving of notice (or both), give rise to any of the above.

    (h)  <u>Employees</u>. Attached as Schedule 5.1(h) hereof is a complete list of all

-8-

employees of Seller and their respective rates of compensation (including a breakdown of the portion thereof attributable to salary, bonus and other compensation, respectively) as of the date of Closing.  Each employee is an employee at will and there are no collective bargaining agreements affecting any employee of Seller.  Buyer shall not be obligated to hire any of Seller's employees.  Seller will not discourage any employee from seeking employment with Buyer.

(i)  **Employee Relations and Benefit Plans**.  Set forth on Schedule 5.1(i) is an accurate and complete list of all agreements of any kind between Seller and its employees or group of employees, including, without limitation, employment agreements, collective bargaining agreements and benefit plans.  Buyer shall not, by the execution and delivery of this Agreement or otherwise, become obligated to or assume any liabilities or contractual obligations with respect to any employee of Seller or otherwise become liable for or obligated in any manner (contractual or otherwise) to any employee of Seller, including, without limiting the generality of the foregoing, any liability or obligation pursuant to any collective bargaining agreement, employment agreement, or pension, profit sharing or other employee benefit plan (within the meaning of Section 3(3) of the Employment Retirement Income Security Act of 1974, as amended) or any other fringe benefit program maintained by Seller or to which Seller contributes or any liability for the withdrawal or partial withdrawal from or termination of any such plan or program by Seller.

(j)  **Current Annual Revenue**.  The average monthly gross revenue of Seller for each of the three full calendar months following the Closing Date shall be at least $426,000 per month.

(k)  **Financial Statements**.  Seller has delivered to Buyer copies of Seller's balance sheet as of December 31, 1996 (the "Balance Sheet Date"), and a statement of income and retained earnings for the year then ended (the "Financial Statements").  The Financial Statements (including all footnotes thereto) have been prepared in accordance with generally accepted account principles ("GAAP"), applied on a consistent basis throughout the periods indicated.  The Financial Statements (including all footnotes thereto) are true, complete and correct and present fairly the financial condition and the results of the operations of Seller for the periods indicated thereon.  All reserves for contingent risks have been estimated in accordance with GAAP and are appropriate and sufficient to cover all costs reasonably expected to be incurred from such risks.  The Financial Statements are consistent with the books and records of Seller (which books and records are correct and complete).

(l)  **Taxes**.  No federal, state, local or other tax returns or reports filed by Seller (whether filed prior to, on or after the date hereof) with respect to the Business or the Assets will result in any taxes, assessments, fees or other governmental charges upon the Assets or Buyer, whether as a transferee of the Assets or otherwise.  All federal, state and local taxes due and payable with respect to the Business or the Assets have been

paid, including, without limiting the generality of the foregoing, all federal, state and local income, sales, use, franchise, excise and property taxes.

(m) **Hazardous Materials**. Neither Seller nor Stockholders has ever generated, transported, stored, handled, recycled, reclaimed, disposed of, or contracted for the disposal of, hazardous materials, hazardous wastes, hazardous substances, toxic wastes or substances, infectious or medical waste, radioactive waste or sewage sludges as those terms are defined by the Resource Conservation and Recovery Act of 1976; the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"); the Atomic Energy Act of 1954; the Toxic Substances Control Act; the Occupational Health and Safety Act; any comparable or similar Delaware statute; or the rules and regulations promulgated under any of the foregoing, as each of the foregoing may have been from time to time amended (collectively, "Hazardous Materials"). Seller has never owned, operated, had an interest in, engaged in and/or leased a waste transfer, recycling, treatment, storage or disposal facility, business or activity other than the Business. Seller has obtained and maintained all necessary trip tickets, signed by the applicable waste generators, and other records demonstrating the nature of the waste transported in connection with the Business. No employee, contractor or agent of Seller has, in the course and scope of employment with Seller, been harmed by exposure to Hazardous Materials. Seller has no direct or contingent liability or obligation for or in connection with any claimed release, discharge or leak of any substance into the environment. Attached hereto as Schedule 5.1(m) is a complete list of the names and addresses of all disposal sites at any time now or in the past utilized by Seller, none of which sites is listed on the CERCLA list or the National Priorities List of Hazardous Waste Sites or any comparable Delaware list. Neither Seller nor Stockholders is listed as potentially responsible party under CERCLA or any comparable or similar Delaware statute; neither Seller nor Stockholders has received any notice of such a listing; and neither Seller nor Stockholders knows of any facts or circumstances which could give rise to such a listing.

(n) **Government Notices**. Seller has delivered to Buyer a description and copies, as of the date of this Agreement, of all notifications, filed or submitted, or required to be filed or submitted, to governmental agencies and of all material notifications from such governmental agencies relating to Seller and the Assets or relating to the discharge or release of materials into the environment or otherwise relating to the protection of the public health or the environment.

(o) **Absence of Price Renegotiation Contracts**. Seller is not now nor has it ever been a party to any contracts subject to price redetermination or renegotiation.

(p) **Underground Storage Tanks**. Seller has never owned, leased or operated any real estate having any underground storage tanks containing petroleum products or wastes or other hazardous substances regulated by 40 CFR 280 and/or other applicable federal, state or local laws, rules and regulations and requirements.

**(q)** **Completeness of Disclosure**. This Agreement and the Schedules hereto and all other documents and information furnished to Buyer and its representatives pursuant hereto do not and will not include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading. If Seller or Stockholders become aware of any fact or circumstance which would change a representation or warranty of Seller or Stockholders in this Agreement, the party with such knowledge shall immediately give notice of such fact or circumstance to Buyer. However, such notification shall not relieve Seller or Stockholders of their obligations under this Agreement, and at the sole option of Buyer, the truth and accuracy of any and all warranties and representations of Seller and Stockholders at the date of this Agreement shall be a precondition to the consummation of this transaction.

**Section 5.2** **Survival**. Each of the representations and warranties set forth in this Article 5 shall survive the Closing and the transfer of the Assets.

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES OF BUYER**

**Section 6.1**. Buyer represents and warrants to Seller and Stockholders that:

**(a)** **Corporate Organization**. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**(b)** **Authorization**. Buyer has all requisite corporate power and corporate authority to enter into this Agreement, perform its obligations hereunder and consummate the transactions contemplated hereby. The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the compliance by Buyer with the terms of this Agreement do not and will not conflict with or result in a breach of any terms of, or constitute a default under, Buyer's Articles of Incorporation or Bylaws or any other agreement or instrument to which Buyer is a party or by which Buyer is bound. All necessary corporate action has been taken by Buyer with respect to the execution and delivery of this Agreement, and this Agreement constitutes a valid obligation of Buyer enforceable in accordance with its terms except as limited by bankruptcy, insolvency, reorganization or other such laws concerning the rights of creditors.

**Section 6.2** **Survival**. Each of the representations and warranties set forth in this Article 6 shall survive the Closing and the transfer of the Assets.

**ARTICLE 7. NONCOMPETITION**

**Section 7.1** **Noncompetition Covenants**. Seller and Stockholders jointly and severally agree that for a period of five years following the date of Closing, none of them shall directly or indirectly, through a subsidiary or affiliate, without the prior express written consent of Buyer:

(i)   engage, whether as a corporation or on their own account, as an officer, director, shareholder, owner, partner, joint venturer, investor, agent, in a managerial capacity, advisor, or as a sales representative, in the business of recycling, or siting, developing, constructing, permitting or operating a waste transfer station or a landfill or landfarm for the disposal of waste; or transportation or collection of waste, in each case, within a radius of 100 air miles of Wilmington, Delaware (the "Territory"), or in the case of Stockholder Michael Bandurski the territories defined as New Castle County, above the C&D Canal;

(ii)   call upon any person who is, at that time, within the Territory, an employee of Buyer in a managerial capacity for the purpose or with the intent of enticing such employee away from or out of the employ of Buyer;

(iii)   call upon any person or entity which is, at that time, or which has been, within one year prior to that time, a customer of Seller or Buyer, as the case may be, within the Territory for the purpose of:  recycling; or siting, developing, constructing, permitting or operating a waste transfer station or a landfill or landfarm for the disposal of waste; or transportation or collection of waste, in each case within the Territory;

(iv)   disclose the identity of Seller's or Buyer's customers, whether in existence or proposed, to any person, firm, partnership, corporation or business for any reason or purpose whatsoever; or

(v)   promote or assist, financially or otherwise (including, without limitation, lending, guaranteeing loans or otherwise providing financial assurance in any way), any person, firm, partnership, corporation or other entity whatsoever to do any of the above.

Notwithstanding the above, the foregoing covenant shall not be deemed to prohibit Seller or Stockholders from acquiring as an investment not more than one percent of the capital stock of a competing business, whose stock is traded on a national securities exchange or over-the-counter.

**Section 7.2  Injunctive Relief**.  Because of the difficulty of measuring economic losses to Buyer as a result of the breach of the foregoing covenant, and because of the immediate and irreparable damage that would be caused to Buyer for which it would have no other adequate remedy, Seller and Stockholders agree that, in the event of breach by any of them of the foregoing covenant, the covenant may be enforced by Buyer by, without limitation, injunctions and restraining orders.

**Section 7.3  Reasonableness of Covenants**.  It is agreed by the parties that the foregoing covenants in this Section 7 impose a reasonable restraint on Seller and Stockholders in light of the activities and business of the buyer on the date of the execution of this Agreement and the future plans of the Buyer.

**Section 7.4  Severability of Covenants**.  The covenants in this Section 7 are severable and separate, and the unenforceability of any specific covenant shall not affect the provisions of any other covenant.  Moreover, in the event any court of competent jurisdiction shall determine that the scope, time or territorial restrictions set forth are unreasonable, then it is the intention of the parties that such restrictions be enforced to the fullest extent which the court deems reasonable, and the Agreement shall thereby be reformed.

**Section 7.5  Independent Covenants**.  All of the covenants in this Section 7 shall be construed as an agreement independent of any other provision of this Agreement, and the existence of any claim or cause of action of Seller or Stockholders against Buyer, whether predicated on this Agreement or otherwise, shall not constitute a defense to the enforcement by Buyer of such covenants.  It is specifically agreed that the duration of the noncompetition covenants stated above shall be computed by excluding from such computation any time during which Seller or Stockholders is in violation of any provision of this Section 7 and any time during which there is pending in any court of competent jurisdiction any action (including any appeal from any judgment) brought by any person, whether or not a party to this Agreement, in which action Buyer seeks to enforce the agreements and covenants of Seller or Stockholders or in which any person contests the validity of such agreements and covenants or their enforceability or seeks to avoid their performance or enforcement.

**Section 7.6  Materiality**.  Seller and Stockholders hereby agree that the foregoing noncompetition covenants are a material and substantial part of this transaction.  Accordingly, so long as neither Seller nor Stockholders is in default thereof, Buyer shall pay to Seller and Stockholders an aggregate of $500,000 and other good and valuable consideration for the foregoing covenants.  Such amount shall be payable in five equal annual installment of $100,000, each commencing on the Closing Date and continuing on each of the first, second, third and fourth anniversaries of the Closing Date.

## ARTICLE 8.  CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLER AND STOCKHOLDERS

The obligations of Seller and Stockholders hereunder are subject to the completion, satisfaction, or at their option, waiver, on or prior to the Closing Date, of the following conditions.

**Section 8.1  Representations and Warranties**.  The representations and warranties of Buyer contained in this Agreement shall be accurate on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of such date; and each and all of the terms, covenants and conditions of this Agreement to be complied with and performed by Buyer on or before the Closing Date shall have been duly complied with and performed.

## ARTICLE 10. NON-ASSUMPTION OF LIABILITY; INDEMNIFICATION

**Section 10.1   Non-Assumption of Liabilities.**  Except as explicitly set forth in Section 10.2 below, Buyer shall not, by the execution and performance of this Agreement or otherwise, assume, become responsible for or incur any liability or obligation of any nature of Seller or Stockholders whether legal or equitable, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, whether arising out of occurrences prior to, at or after the date of Closing, including, without limiting the generality of the foregoing, any liability or obligation arising out of or relating to: (a) any occurrence or circumstance (whether known or unknown) which occurs or exists on or prior to the date of Closing and which constitutes, or which by the lapse of time or giving notice (or both) would constitute, a breach or default under any lease, contract, or other instrument or agreement (whether written or oral); (b) any injury to or death of any person or damage to or destruction of any property, whether based on negligence, breach of warranty, or any other theory; (c) a violation of the requirements of any governmental authority or of the rights of any third person, including, without limitation, any requirements relating to the reporting and payment of federal, state, local or other income, sales, use, franchise, excise or property tax liabilities of Seller or Stockholders; (d) the generation, collection, transportation, storage or disposal by Seller or Stockholders of any materials, including, without limitation, Hazardous Materials; (e) an agreement or arrangement between Seller and the employees of Seller or Stockholders or any labor or collective bargaining unit representing any such employees; (f) the severance pay obligation of Seller or any employee benefit plan (within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) or any other fringe benefit program maintained or sponsored by Seller or Stockholders or to which Seller or Stockholders contributes or any contributions, benefits or liabilities therefor or any liability for the withdrawal or partial withdrawal from or termination of any such plan or program by Seller or Stockholders; (g) the debts or other liabilities of Seller or Stockholders; (h) any litigation whether or not listed on Schedule 5.1(g); (i) the liabilities or obligations of Seller or Stockholders for brokerage or other commissions relative to this Agreement or the transactions contemplated hereunder; and (j) the liabilities or obligations of Seller or Stockholders related to any real estate now or previously owned or leased by Seller or Stockholders.  Seller and Stockholders each agree to indemnify Buyer, its successors and assigns from and against all of the above liabilities and obligations in accordance with Section 10.3 below.

**Section 10.2   Assumption of Specific Liabilities.**  Buyer agrees to perform all of Seller's contractual obligations related to the Customer Contracts to the extent, and only to the extent, such obligations first mature and are required to be performed after the close of business on the Closing Date.

**Section 10.3   Indemnification by Seller and Stockholders.**  Notwithstanding investigation at any time made by or on behalf of Buyer, the Seller and Stockholders jointly and severally agree to defend, indemnify and hold harmless Buyer, its officers, shareholders, directors, divisions, subdivisions, affiliates, parent, employees, agents, successors, assigns and the Assets from and against all losses, claims, actions, causes of action, damages, liabilities,

-15-

**Section 8.2  No Adverse Proceeding**.  No action or proceeding before a court or any other governmental agency or body shall have been instituted or, to the best of Buyer's knowledge, threatened to restrain or prohibit any of the transactions contemplated by this Agreement.

**ARTICLE 9.  CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER**.  The obligations of Buyer hereunder are subject to the completion, satisfaction or, at its option, waiver, on or prior to the Closing Date, of the following conditions.

**Section 9.1  Representations and Warranties**.  The representations and warranties of Seller and Stockholders contained in this Agreement shall be accurate on and as of the Closing Date with the same effect as though such representations and warranties had been made on an as of such date.

**Section 9.2  Covenants**.  Each and all of the terms, covenants and conditions of this Agreement to be complied with and performed by Seller or Stockholders on or before the Closing Date shall have been duty complied with and performed.

**Section 9.3  No Adverse Proceeding**.  No action or proceeding before a court or any other governmental agency or body shall have been instituted or threatened to restrain or prohibit any of the transactions contemplated by this Agreement, and no governmental agency or body shall have taken any other action or made any request of Buyer as a result of which the management of Buyer deems it inadvisable to proceed with the transactions hereunder.

**Section 9.4  Consents**.  All necessary notices to, consents of and filings with any governmental authority or agency or other third party relating to the consummation of the Closing or the other transactions contemplated herein to be made or obtained by Seller or Stockholders shall have been obtained and made.

**Section 9.5  Transferability of Permits**.  Buyer shall have determined, in its sole discretion, that as a result of this transaction all of the permits required for the operation of the Business have been transferred to Buyer, or can be so transferred without public hearing or other regulatory approval process.

**Section 9.6  Environmental Review**.  Buyer, through its authorized representatives, must have completed a review (including without limitation, all testing, inspections and other procedures, review of existing files of, and discussions with, governmental agencies and officials having jurisdiction over the Assets) of the environmental and land use practices, procedures, operations and activities of Seller and the Assets; the results of which review, without limiting the generality of the foregoing, reflects compliance with all Applicable Laws governing the operations of Seller, discloses no capital expenditures or other substantive environmental, land use or real estate related concerns, and are otherwise satisfactory in all respects to Buyer in its sole discretion.

expenses and other costs of any kind or amount whatsoever (including, without limitations, reasonable attorneys' fees), whether equitable or legal, matured or contingent, known or unknown, foreseen or unforeseen, ordinary or extraordinary, patent or latent, which result, either before or after the date of Closing from:

(a)    inaccuracy in any representation or warranty made by Seller or Stockholders in this Agreement;

(b)    breach of any representations or warranty under this Agreement by Seller or Stockholders;

(c)    failure of Seller or Stockholders duly to perform and observe any term, provision, covenant, agreement or condition under this Agreement;

(d)    liability of Seller or Stockholders imposed upon Buyer (including, without limitation, all liability for the generation, collection, transportation, storage or disposal of any materials, including, without limitation, Hazardous Materials, whether or not disclosed on Schedule 5.1(m) hereof);

(e)    misrepresentation in or omission from any Schedule to this Agreement;

(f)    failure of Seller or Stockholders to obtain consent to a Customer Account requiring such consent (including without limitation, reimbursement to Buyer of the value of such nonassigned Customer Account);

(g)    liability of Seller or Stockholders imposed upon Buyer as a result of Seller's failure to comply with the bulk transfer law of Delaware;

(h)    liability of Seller or Stockholders resulting from one or more pending or threatened lawsuits whether or not listed on Schedule 5.1(g);

(i)    liability of Seller or Stockholders to creditors of Seller or Stockholders which is imposed on Buyer whether as a result of bankruptcy proceedings or otherwise and whether as an account payable by Seller or Stockholders or as a claim of alleged fraudulent conveyance or preferential payments within the meaning of the United States Bankruptcy Code or otherwise;

(j)    the existence of creditors of Seller which are not disclosed to Buyer;

(k)    any of the matters described in Section 10.1 hereof; and

(l)    any claim by a third party that, if true, would mean that a condition for indemnification set forth in this Section 10.3 had been satisfied.

Buyer shall be deemed to have suffered such loss, claim, action, cause of action, damages, liability, expense or other cost, or to have paid or to have become obligated to pay any sum on account, of, the matters referred to in subparagraphs (a) - (l) of this Section 10.3 if the same shall be suffered, paid or incurred by Buyer or any parent, subsidiary, affiliate, or successor of Buyer. The amount of the loss, claim, action, cause of action, damages, liability, expense or other cost deemed to be suffered, paid or incurred by Buyer shall be an amount equal to the loss, claim, action, cause of action, damages, liability, expense or other cost suffered, paid or incurred by such parent, subsidiary, affiliate, or successor.

<strong><u>Section 10.4  Procedure for Indemnification</u></strong>.  Promptly after a party hereto (hereinafter the "Indemnified Party") has received notice of or has knowledge of any claim by a person not a party to this Agreement ("Third Person") or the commencement of any action or proceeding by a Third Person, the Indemnified Party shall, as a condition precedent to a claim with respect thereto being made against any party obligated to provide indemnification pursuant to this Agreement (hereinafter the "Indemnifying Party"), give the Indemnifying Party written notice of such claim or the commencement of such action or proceeding (the "Notice"). The Notice shall state the nature and the basis of such claim and a reasonable estimate of the amount thereof. The Indemnifying Party, after receipt of the Notice, shall defend and settle, at its own expense and by its own counsel, each such matter so long as the Indemnifying Party pursues the same diligently and in good faith and the claim does not involve injunctive or equitable relief or involve the possibility of criminal penalties. The Indemnified Party shall cooperate with the Indemnifying party and its counsel in the defense thereof and in any settlement thereof. Such cooperation shall include, but shall not be limited to, furnishing the Indemnifying party with any books, records or information reasonably requested by the Indemnifying party that are in the Indemnified Party's possession or control. Notwithstanding the foregoing, the Indemnified Party shall have the right to participate in any matter through counsel of its own choosing at its own expense, provided that the Indemnifying party's counsel shall always be lead counsel and shall determine all litigation and settlement steps, strategy and the like. After the Indemnifying Party has received the Notice, the Indemnifying party shall not be liable for any additional legal expenses incurred by the Indemnified Party in connection with any defense or settlement of such asserted liability, except to the extent such participation is requested by the Indemnifying Party, in which event the Indemnified Party shall be reimbursed by the Indemnifying Party for reasonable additional legal expenses, out-of-pocket and allocable share of employee compensation incurred in connection with such participation for any employee whose participation is so requested. The foregoing notwithstanding, if the Indemnifying Party fails diligently to defend any such matter to which the Indemnified Party is entitled to indemnification hereunder or if the claim involves injunctive or equitable relief or involves the possibility of criminal penalties, the Indemnified Party may undertake such defense through counsel of its choice and at the Indemnifying party's expense. In each case where the Indemnifying Party is obligated to pay the costs and expenses of the Indemnified Party, the Indemnifying party shall pay the costs and expenses of the Indemnified Party as such costs and expenses are incurred.

## ARTICLE 11. GENERAL

**Section 11.1  Further Assurance**.  From time to time after the Closing, Seller and Stockholders will, without further consideration, execute and deliver such other instruments of conveyance and transfer, and take such other action as Buyer reasonably may request to more effectively convey and transfer to and vest in Buyer and to put Buyer in possession of the Assets to be transferred hereunder, and in the case of contracts and rights, if any, which cannot be transferred effectively without the consents of third parties, to endeavor to obtain such consents promptly, and if any be unobtainable, to use their best efforts to provide Buyer with the benefits thereof in some other manner.  Seller and Stockholders will cooperate and use its best efforts to have the present officers, directors and employees of Seller cooperate with Buyer on and after the Closing in furnishing information, evidence, testimony and other assistance in connection with any actions, proceedings, arrangements or disputes of any nature with respect to matters pertaining to all periods prior to the Closing.

**Section 11.2  Joint and Several Obligation**.  All representations, warranties and agreements of Seller or Stockholders under this Agreement, the Schedules and the transactions contemplated hereby shall be joint and several.  Notwithstanding, the joint and several nature of all representations, warranties and agreements contained herein, Buyer agrees that it will seek resolution of a claim relating to breach of a representation or warranty of Seller, Stockholder Walter S. Bandurski or Stockholder Michael Bandurski against Seller, Stockholder Walter S. Bandurski or Stockholder Michael Bandurski before seeking resolution of such claim against Stockholder Barbara Bandurski.  Resolution shall mean completion of arbitration as defined in Section 11.12 herein.

**Section 11.3  Waiver**.  Except as otherwise provided herein, no delay of or omission in the exercise of any right, power or remedy accruing to any party as a result of any breach or default by any other party under this Agreement shall impair any such right, power or remedy, nor shall it be construed as a waiver of or acquiescence in any such breach or default, or of or in any similar breach or default occurring later; not shall any waiver of any single breach or default be deemed a waiver of any other breach of default occurring before or after that waiver.

**Section 11.4  Time of the Essence**.  Time is of the essence of this Agreement.

**Section 11.5  Notice**.  All notices or communications required or permitted under this Agreement shall be given in writing and served either by personal delivery, overnight courier or by deposit in the United States mail and sent by first class registered or certified mail, return receipt requested, postage prepaid:

If to Seller or Stockholders:

Walter S. Bandurski
P.O. Box 9264
Wilmington, DE 19809

with copies to:

James P. Dalle Pazze, Esq.                 Beverly J. Wik, Esq.
Saul Ewing Remick & Saul                   Bayard, Handelman & Murdoch, P.A.
222 Delaware Avenue, #1200                 P.O. Box 25130
P.O. Box 1266                              Wilmington, DE 19899
Wilmington, DE 19899

If to Buyer:

USA Waste of Delaware, Inc.
111 Paterson Ave.
Hoboken, NJ 07030
ATTN:  Assistant Regional Vice President

with a copy to:

USA Waste Services, Inc.
1001 Fannin Street
Suite 4000
Houston, TX 77002
ATTN:  General Counsel

with a copy to:

James McC. Geddes, Esq.
Ashby & Geddes
One Rodney Square, Suite 302
P.O. Box 1150
Wilmington, DE 19899

Notice shall be deemed given and effective the day personally delivered, the day after being sent by overnight courier, subject to signature verification, and three days after deposit in the U.S. mail as provided above, or when actually received, if earlier.  Either party may change the address for notices or communications to be given to it by written notice to the other party given as provided in this Section.

Section 11.6  **Entire Agreement**.  This Agreement, the Schedules hereto and the other agreements referred to herein constitute the entire agreement and understanding of the parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings, oral or written, relative to said subject matter.

Section 11.7  **Binding Effect; Assignment**.  This Agreement and the various rights and obligations arising hereunder shall inure to the benefit of and be binding upon the

-19-

parties hereto and their respective executors, administrators, heirs, legal representatives, successors and permitted assigns. Seller and Stockholders shall have no right to assign this Agreement or any of their respective rights hereunder. Buyer may assign this Agreement without consent by Seller or Stockholders; provided, however, that the assignee under such assignment shall agree to assume the obligations of the assignor under this Agreement. It is further understood and agreed that Buyer may be merged or consolidated with another entity and that any such entity shall automatically succeed to the rights, powers and duties of Buyer hereunder.

**Section 11.8    Expenses of Transaction**. Seller shall pay all costs and expenses incurred by Seller or Stockholders in connection with this Agreement and the transactions contemplated hereby and thereby, including, without limitation, the fees and expenses of Seller's attorneys and accountants and will make all necessary arrangements so that the Assets will not be charged with or diminished by any such cost or expense. Buyer shall pay all costs and expenses incurred by it in connection with this Agreement and the transactions contemplated hereby and thereby, including without limitation, the fees and expenses of its attorneys and accountants.

**Section 11.9    Broker's Commission**. Seller and Stockholders represent and warrant to Buyer and Buyer represents and warrants to Seller and Stockholders that the warranting party has had no dealing with any dealer, broker or agent so as to entitle such dealer, broker or agent to a commission or fee in connection with the sale of the Assets to Buyer. If for any reason any commission or fee shall become due, the party dealing with such dealer, broker or agent shall pay such commission or fee and agrees to indemnify and save the other party harmless from all claims for such commission or fee and from all attorneys' fees, litigation costs and other expense relating to such claim.

**Section 11.10    Modification; Remedies Cumulative**. This Agreement may not be changed, amended, terminated, augmented, rescinded or otherwise altered, in whole or in part, except by a writing executed by all of the parties hereto. No right, remedy or election given by any term of this Agreement shall be deemed exclusive but each shall be cumulative with all other rights, remedies and elections available at law or in equity.

**Section 11.11    Severability**. In case any provision of this Agreement shall be invalid, illegal or unenforceable, it shall, to the extent possible, be modified in such manner as to be valid, legal and enforceable but so as to most nearly retain the intent of the parties. If such modification is not possible, such provision shall be severed from this Agreement. In either case the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

**Section 11.12    Arbitration**. The parties agree that they will attempt to resolve any dispute between or among them arising out of and by reason of this Agreement by first submitting such dispute to non-binding arbitration in the same manner provided for in Paragraph 2.4; provided that the hearing and resolution of such dispute must occur within 60 days after the

dispute first arose or any party may then seek resolution through appropriate judicial means.

      **Section 11.13**    **Governing Law**.    This Agreement shall in all respects be governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware, and jurisdiction for any dispute arising from this Agreement shall be vested exclusively in the County of New Castle, State of Delaware.

      **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the day and year first above written.

BUYER:

ATTEST:

USA WASTE OF DELAWARE, INC.

By: _____
    E. Thomas Harvey, III

SELLER:

ATTEST:

WALTER S. BANDURSKI, INC.

By: _____
    Walter S. Bandurski, President

_____
Witness

_____
**Walter S. Bandurski**, Individually and as Stockholder of Seller

_____
Witness

_____
**Barbara Bandurski**, Individually and as Stockholder of Seller

_____
Witness

_____
**Michael Bandurski**, Individually and as Stockholder of Seller

-21-

## LIST OF SCHEDULES

Schedule 1.1(a) --     Equipment

Schedule 1.1(b) --     Rolling Stock

Schedule 1.1(c) --     Radios and Routing and Billing Information

Schedule 1.1(d) --     Customer Accounts and Related Approvals

Schedule 1.2   --     Excluded Assets

Schedule 1.3   --     Customer Accounts Requiring Consent to Assignment

Schedule 1.4     --     Accounts Receivable

Schedule 5.1(f) --     Personal Property Leases

Schedule 5.1(g) --     Litigation

Schedule 5.1(h) --     Employees

Schedule 5.1(i) --     Employee Agreements

Schedule 5.1(m) --     List of Disposal Sites

24987.1

# SCHEDULE 1

## LIST OF EQUIPMENT

| Serial # | Make | Model | Weight | Tag # | Year | Value |
|----------|------|-------|--------|-------|------|-------|
| **FRONT END** | | | | | | |
| 1WXDCHJEXHN119668 | White | WX64 | 60,500 | C61351 | 1987 | $4,760 |
| 4V2DCFME3NN645766 | White | WX64 | 62,800 | C32712 | 1992 | $18,025 |
| 4V2DCFMEGRN678700 | White GMC | XPD | 65,000 | CL84204 | 1994 | $43,780 |
| 4V2DCFMEXSN696418 | White GMC | XPD | 65,000 | CI5383 | 1994 | $43,780 |
| 1M2KI95C8TM007381 | Mack | 600 | 64,000 | CL38993 | 1996 | $66,300 |
| 1M2K195C7TM007176 | Mack | TK | 65,000 | CL10119 | 1996 | $66,300 |
| 475DCFMEXTR723260 | Volvo | | 65,000 | CL38993 | 1996 | $66,300 |
| **REAR LOADERS** | | | | | | |
| 1WBPUCCJE7GU301094 | Autocar | K | 65,000 | C33210 | 1986 | $250 |
| 4V2DCFJE6JN607964 | White | WX64 | 65,000 | CL44358 | 1988 | $250 |
| **ROLL OFF** | | | | | | |
| 1WBUCCJE5FU099101 | Autocar | DK64 | 65,000 | CL24107 | 1985 | $250 |
| 1WBUCCJE7HU301505 | Autocar | DK64 | 65,000 | CL38145 | 1987 | $4,760 |
| 4V2SCBJEXKU501900 | White | WG64 | 65,000 | C89474 | 1988 | $9,520 |
| 1WBUCCJE3GU301564 | Autocar | DK64 | 65,000 | CL31085 | 1986 | $250 |
| 1WBUCCJE7GU99084 | Autocar | DK64 | 65,000 | CL26985 | 1986 | $250 |
| 2WLNCCCFXTK941292 | W. Star | | 66,400 | CL100992 | 1996 | $47,600 |
| 4V5JCBJF1TR842825 | Volvo | | 66,000 | CL38145 | 1996 | $47,600 |

**TOTAL**    $419,975

## FRONT END CONTAINERS

| Size | Number |
|------|--------|
| 2 | 238 |
| 3 | 27 |
| 4 | 346 |
| 6 | 211 |
| 8 | 150 |
| **TOTAL** | **972** |

## ROLL OFF CONTAINERS

| Size | Number |
|------|--------|
| 10 | 10 |
| 15 | 4 |
| 20 | 22 |
| 30 | 230 |
| 40 | 19 |
| **TOTAL** | **285** |

## COMPACTORS

**Number**

2

## OTHER EQUIPMENT

| Description | Date of Purchase |
|-------------|------------------|
| 86 John Deere | 9/8/86 |
| 90 John Deere | 7/25/90 |
| 86 Fork Lift | 11/3/86 |
| 88 Crawler | 6/21/88 |
| 84 Haris Bailer | 10/84 |

2

Statement of Purposes and Transactions

The purposes of the transaction described in the Agreement and Plan of Reorganization (the "Reorganization") are to improve and advance both the business of the taxpayer and the business of the buyer of the taxpayer's business (the "Buyer") and assets by combining the two businesses through the Buyer's acquisition of the taxpayer's assets relating to the taxpayer's business and the continuation by the Buyer of the taxpayer's business.

The Reorganization was composed of the following transactions (all pursuant to the Agreement and Plan of Reorganization dated July 31, 1997 and the Purchase and Sale of Assets Agreement dated July 31, 1997):

> (1) the transfer by the taxpayer to the Buyer of substantially all of the taxpayer's assets (specifically those listed in the Purchase and Sale of Assets Agreement attached as Exhibit A of this document and also listed in Exhibit C of this document),

> (2) the transfer by the Buyer to the taxpayer of common stock of the Buyer's corporate parent in consideration for such assets (as detailed in Purchase and Sale of Assets Agreement attached as Exhibit A of this document and also listed in Exhibit D of this document),

> (3) the assumption by the Buyer of certain liabilities of the taxpayer (specifically those listed in the Purchase and Sale of Assets Agreement attached as Exhibit A of this document and also listed in Exhibit E of this document), and

> (4) the distribution of that common stock of the Buyer's corporate parent by the taxpayer to its stockholders and the dissolution of the taxpayer.

Under penalties of perjury, I declare that I have examined this Statement of Purposes and Transactions, and to the best of my knowledge and belief, it is true, correct and complete.

Walter S. Bandurski, Inc.

By: _Susan Brooks_____

Susan Brooks, President

Exhibit B



| Exhibit C | | | |
|---|---|---|---|
| Walter S Bandurski, Inc.<br>ID# 51-0107019 | | Year 1997 | |
| Basis of Assets Sold | | | |
| Pursuant to tax free reorganization under Sec 368(a)(1)(C) | | | |
| | Cost | Accumulated<br>Depreciation | Net<br>Book Value |
| Front Load Trucks | 1,011,649 | 685,515 | 326,134 |
| Rear Load Trucks | 137,340 | 123,278 | 14,062 |
| Roll Off Trucks | 809,121 | 710,016 | 99,105 |
| Service Trucks | 65,018 | 57,453 | 7,565 |
| Yard Equipment | 122,502 | 122,502 | 0 |
| Containers | 1,868,330 | 1,782,605 | 85,725 |
| Office Equipment | 14,162 | 12,598 | 1,564 |
| Truck Route | 15,068 | 5,117 | 9,951 |
| | 4,043,190 | 3,499,084 | 544,106 |
| Permits, Licenses, Intellectual Property,<br>Business Name, Goodwill and all other | | | |
| Intangible Assets | 0 | 0 | 0 |
| Total | 4,043,190 | 3,499,084 | 544,106 |



Statement of stock received in the exchange

The sole consideration received by the taxpayer in the exchange constituting the Reorganization described in the Agreement and Plan of Reorganization was ninety-four thousand three hundred eighty-one shares of the common stock of USA Waste Services, Inc. No other stock, securities, or other property was received by the taxpayer in connection with the exchange constituting the Reorganization.

The fair market value of the stock as of the date of the exchange was $3,876,068.62.

All of the common stock of USA Waste Services, Inc. received by the taxpayer in the exchange was distributed in calendar year 1998 by the taxpayer to its stockholders in complete termination of their interests in the taxpayer and the taxpayer was dissolved.

Exhibit D

