Checkpoint Contents
  Federal Library
    Federal Source Materials
      Federal Tax Decisions
        American Federal Tax Reports
          American Federal Tax Reports (Current Year)
            Advance AFTR
              McCORD v. COMM., 98 AFTR 2d 2006-XXXX, (CA5), 08/22/2006 advance

American Federal Tax Reports

# McCORD v. COMM., Cite as 98 AFTR 2d 2006-XXXX, 08/22/2006

SUCCESSION OF CHARLES T. McCORD, JR., Deceased, CHARLES T. McCORD III and MICHAEL S. McCORD, EXECUTORS; MARY S. McCORD, Donors, Petitioners-Appellants, v. COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

## Case Information:

| Code Sec(s): | |
|---|---|
| Court Name: | IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT, |
| Docket No.: | No. 03-60700, |
| Date Decided: | 08/22/2006. |
| Disposition: | |

## HEADNOTE

.

*Reference(s):*

## OPINION

**IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT,**

**Appeals from the United States Tax Court (7048-00)**

Before GARWOOD, WIENER, and DeMOSS, Circuit Judges.

**Judge:** WIENER, Circuit Judge

This is an appeal from an adverse opinion and judgment of an 8-judge majority (the "Majority") of a splintered United States Tax Court. [1] The Petitioners-Appellants (the "Taxpayers") [2] seek reversal of the Majority's holdings, which the Taxpayers accurately characterize as:

((1)) The aggregate fair market value of the Taxpayers' donated interests in a family limited partnership, McCord Interests, Ltd., L.L.P. ("MIL") was $9,883,832 instead of the substantially lesser value of $7,369,215 claimed by the Taxpayers on their returns.
((2)) The Taxpayers' charitable deductions under § 2522 of the Internal Revenue Code of 1986

("I.R.C.") for gifts to one of two tax-exempt organizations (collectively, "exempt donees") must be calculated not on the basis of the plain language of the act of gift ("Assignment Agreement") of January 12, 1996, but on the Tax Court's own gloss thereon and its determination of the various percentage interests in MIL that — two months after the gifts — were agreed on and accepted by all donees (but not by Taxpayers) in a post-gift sharing arrangement (the "Confirmation Agreement") entered into in March of 1996.

((3)) The taxable value of the gifts made by the Taxpayers to (a) their four sons individually ("the Sons") and (b) generation skipping tax trusts ("GST trusts") of which the Sons were trustees (collectively, "the non-exempt donees") must be calculated not only on the basis of the Tax Court's independently determined fair market value and the percentage interests in MIL of the residuary exempt donee, but also without a reduction in fair market value of the gifts to the non-exempt donees for the actuarially determined liability, assumed by such donees contemporaneously with the gifts, for any additional estate taxes that might be incurred under § 2035 (and, in the case of Mr. McCord, that were incurred) if either or both of the Taxpayers should die within three years following the date of the gifts [3] — death within that post-gift period being a condition subsequent that would terminate the donors' (and thus the non-exempt donees') present obligations to pay any and all eventual § 2035 estate taxes.

For the reasons explained below, we reverse the Tax Court and remand this case to it with instructions to enter judgment for the Taxpayers consistent with this opinion.

# I. Facts and Proceedings

## A. Background

With the exception of the ultimate fact question of the taxable and deductible values of the limited partnership interests in MIL that comprise the completed, irrevocable inter vivos donations (the "gifts") made by the Taxpayers to the exempt and non-exempt donees on January 12, 1996, the discrete facts framing this case are largely stipulated or otherwise undisputed. Having lived in Shreveport, Louisiana, for most of their adult lives, and having accumulated substantial and diversified assets, these octogenarian Taxpayers embarked on a course of comprehensive family wealth preservation and philanthropic support planning, including transfer tax aspects of implementing such a plan. This was done in consultation with Houston-based specialists in that field.

Effective June 30, 1995, the Taxpayers had joined with the Sons and an existing ordinary partnership ("McCord Bros." formed and owned equally by the Sons) to create MIL, a Texas limited partnership. In creating MIL, (1) each Taxpayer had contributed $10,000 for which each had received one-half of all the Class A limited partners interest in MIL; (2) each Son had contributed $40,000 for which he had received one-fourth of all the general partners' interest in MIL; (3) each Taxpayer had contributed identical interests in substantial business and investment assets (valued at $6,147,192 per Taxpayer) for which each Taxpayer had received equal portions (but less than all) of the Class B limited partners interests in MIL, representing in the aggregate just over 82 per cent of the value of that partnership; and (4) McCord Bros. had contributed interests in similar business and investment assets (valued at $2,478,000), for which it had received the remaining Class B limited partners interest in MIL, representing roughly 16.6 per cent of the value of that partnership. [4] As a result, MIL was initially owned as follows:

| Class and Contributor | Contribution | Percentage Interest |
|---|---|---|
| Class A limited partners: | | |
| Mr. McCord | $ 10,000 | -- |
| Mrs. McCord | 10,000 | -- |
| General partners: | | |
| Charles III | 40,000 | 0.26787417 |
| Michael | 40,000 | 0.26787417 |
| Frederick | 40,000 | 0.26787417 |

| Stephen | 40,000 | 0.26787417 |
|---|---|---|
| Class B limited partners: | | |
| Mr. McCord | 6,147,192 | 41.16684918 |
| Mrs. McCord | 6,147,192 | 41.16684918 |
| McCord Brothers | 2,478,000 | 16.59480496 |
| Total | $14,952,384 | 100.0 |

As found by the Majority, MIL's partnership agreement (the "Partnership Agreement") provides, inter alia:

> MIL will continue in existence until December 31, 2025 (the termination date), unless sooner terminated in accordance with applicable terms of the partnership agreement.

> Any class B limited partner may withdraw from MIL prior to its termination date and receive payment equal to the fair market value (as determined under the partnership agreement) of such partner's class B limited partnership interest (the put right).

> Partners may freely assign their partnership interests to or for the benefit of certain family members and charitable organizations (permitted assignee).

> A partner desiring to assign his interest to someone other than a permitted assignee must first offer that interest to MIL and all other partners and assignees, who have the right to purchase such interest at fair market value (as determined under the Partnership agreement).

> The term "partnership interest" means the interest in the partnership representing any partner's right to receive distributions from the partnership and to receive allocations of partnership profit and loss.

> Regardless of the identity of the assignee, no assignee of a partnership interest can attain the legal status of partner in MIL without the unanimous consent of all MIL partners.

> MIL may purchase the interest of any [exempt donee] (i.e., a permitted assignee of a partnership interest that is a charitable organization that has not been admitted as a partner of MIL) at any time for fair market value, as determined under the partnership agreement (the call right).

> For purposes of the partnership agreement, (1) a class B limited partner's put right is disregarded for purposes of determining the fair market value of such partner's class B limited partnership interest, and (2) any dispute with respect to the fair market value of any interest in MIL is to be resolved by arbitration as provided in Exhibit G attached to the partnership agreement.

> Limited partners generally do not participate in the management of the partnership's affairs. However, limited partners do have veto power with respect to certain "major decisions", most notably relating to voluntary bankruptcy filings. [5] In addition, if any two of the [Sons] are not serving as managing partners, class B limited partners have voting rights with respect to certain "large dollar" managerial decisions. Limited partners also have access to certain partnership financial information. [6]

MIL's partnership agreement was amended and restated in October 1995, prospectively effective November 1, 1995. Twenty days after the effective date of this act, Taxpayers, as owners of all Class A limited partner interests in MIL, donated these interests to The Southfield School Foundation (the "Foundation"), a § 501(c)(3) tax exempt organization. All original MIL partners — general, Class A limited, and Class B limited — executed an Assignment of Partnership Interests and Addendum

Agreement (the "Southfield Agreement") to implement this gift. The Southfield Agreement declares that "all of the partners of [MIL] desire that [the Foundation] become a Class A limited partner of [MIL] upon execution of this assignment of partnership interest" and that "all consents required to effect the conveyance of the Assigned Partnership Interest and the admission of assignee as a Class A limited partner of [MIL] have been duly obtained and/or evidenced by the signatures hereto." After executing the Southfield Agreement, the Taxpayers were left with only their Class B limited partners interests in MIL. (The donation to the Foundation is not at issue in this litigation; we discuss it only to note differences in its details from those of the Assignment Agreement, which was used to effectuate the Taxpayers' below-discussed donations of Class B interests in MIL to the exempt and non-exempt donees.)

On January 12, 1996, through a combination of simultaneous taxable gifts to the non-exempt donees and charitable-deduction gifts to the exempt donees, the Taxpayers irrevocably disposed of all their Class B limited partners interests in MIL, retaining no interest whatsoever in the Partnership. They did this by joining with all non-exempt donees and two new exempt donees, namely, the Community Foundation of Texas, Inc. ("CFT"), and the Shreveport Symphony, Inc. (the "Symphony"), in the execution of the Assignment Agreement. In it, the Taxpayers transferred all of their Class B limited partners interests in MIL to the exempt and non-exempt donees in varying portions, expressly relinquishing all dominion and control over the partnership interests thus assigned and transferred. The Assignment Agreement differs from the Southfield Agreement in that (1) it does not contain parallel language admitting the new donees as partners, and (2) two of the limited partners of MIL — McCord Bros. and the Foundation — did not join in the execution of the Assignment Agreement in any capacity.

At the heart of this case lies the question of the value of the Class B limited partners interests in MIL thus transferred by the Taxpayers to the exempt and non-exempt donees via the Assignment Agreement of January 12, 1996. We have observed that these gifts divested the Taxpayers of their entire interest in MIL then remaining. It did so, however, not in percentages of interest in MIL, however, but in dollar amounts of the net fair market value of MIL, according to a sequentially structured "defined value clause":

| DONEE | GIFT |
|-------|------|
| 1. First, to the Generation Skipping Tax Trusts ("GST trusts") | A dollar amount of fair market value in interest of MIL equal to the dollar amount of Taxpayers' net remaining generation skipping tax exemption, reduced by the dollar value of any transfer tax obligation owed by these trusts by virtue of their assumption thereof. |
| 2. Second, to the Sons | $6,910,932.52 worth of fair market value in interest of MIL, reduced by the dollar value of (1) the interests in MIL given to the GST trusts, and (2) any transfer tax obligation owed by the Sons by virtue of their assumption thereof. |
| 3. Third, to the Symphony | $134,000.00 worth of such in interest of MIL.<7> |
| 4. Last, to CFT | The dollar amount of the interests of the Taxpayers in MIL, if any, that remained after satisfying the gifts to the GST trusts, the Sons, and the Symphony. |

```
----------------------------------------------------------------
<7> $7,044,932.52 less $6,910,932.52; but only if the full
difference of $134,000 remained; otherwise, any actual, lesser
amount remaining after satisfying the gifts to the GST trusts and
the Sons.
```

All gifts were complete on execution of the Assignment Agreement on January 12, 1996. No other agreements — written or oral, express or implied — were found to have existed between the Taxpayers and (1) the Sons, (2) the GST trusts, (3) the Symphony, or (4) CFT, as to what putative percentage interest in MIL belonged to, or might eventually be received by, any of the donees under the dollar-value formula clause. Rather, because the interests donated by the Taxpayers to the GST trusts, the Sons, and the Symphony were expressed in dollars, "fair market value" is defined in the Assignment Agreement in terms of the applicable "willing-buyer/willing-seller" test specified in the applicable Treasury Regulation. [8]

As reflected in the allocation provisions of the Assignment Agreement, the Taxpayers conditioned their gifts to the non-exempt donees on the presently binding assumption by those donees of responsibility for payment of any and all federal and state gift taxes resulting from the taxable gifts of January 12, 1996. In addition, those donees assumed responsibility for the future payment of only those federal estate taxes that would be assessed on the amount of Taxpayers' gift taxes pursuant to § 2035, unless the condition subsequent expressed in that section should occur, i.e., unless the Taxpayer in question should survive for three years following the completion of the gift. [9]

On February 28, 1996, Mr. Frazier completed his appraisal of the various classes of the partners' interest in MIL as of the January 12, 1996 date of the gifts. He determined that the value on that date had been $89,505 for each one per cent (1%) of Class B limited partners interest in the hands of a donee immediately following completion of the gifts.

In March 1996, all donees entered into the Confirmation Agreement, based on that appraisal. In essence, the Confirmation Agreement translated the dollar value of each gift made under the Assignment Agreement's defined value formula into percentages of interests in MIL, as follows:

```
    1. GST trusts      8.24977954% each
    2. The Sons       11.05342285% each
    3. The Symphony     1.49712307%
    4. CFT              3.62376573%
       Total          82.33369836%
```

The Taxpayers, who two months earlier had divested themselves of all interest in MIL, were not parties to the Confirmation Agreement or otherwise involved in it. Neither did the Assignment Agreement "call for," i.e., either expressly or impliedly, specify any method or manner that the donees must or were expected to employ in determining how to equate their respective dollar-amount gifts to percentages of interest in MIL. [10] Moreover, each donee was represented by independent counsel and each had the express right to review the Frazier appraisal before entering into the Confirmation Agreement. In addition, any exempt donee that might question or disagree with the Frazier appraisal had the right to retain its own appraiser and, if still dissatisfied, to resolve questions of value and allocation of interests in MIL through binding arbitration.

CFT elected to retain outside counsel who, in consultation with CFT's president and its director of development (both of whom were lawyers with extensive experience in reviewing appraisals of closely-held interests), independently analyzed the Frazier appraisal in light of the then-current circumstances. CFT subsequently accepted the Frazier appraisal. Although CFT did not retain an independent appraiser, its officers and outside counsel expressed confidence in Mr. Frazier and his firm, found his methodology appropriate, and concluded that the value of CFT's percentage interest in MIL proposed in the Confirmation Agreement was an acceptable reflection of the dollar value of the interest in MIL that CFT had received from the Taxpayers in January. Neither the Majority Opinion nor any of the four other opinions filed in the Tax Court found evidence of any agreement — not so much as an implicit, "wink-

wink" understanding — between the Taxpayers and any of the donees to the effect that any exempt donee was expected to, or in fact would, accept a percentage interest in MIL with a value less than the full dollar amount that the Taxpayers had given to such a donee two months earlier. [11]

Late in June of 1996, approximately three months after all donees had entered into the Confirmation Agreement, MIL exercised its "call right" under the Assignment Agreement to redeem the exempt donees' interests in MIL. Even though only months had elapsed since the January gifts had been appraised, MIL contracted with Mr. Frazier to update his original appraisal as of June 29, 1996, to determine the then-current fair market value of the interests to be redeemed. After that updated appraisal was completed, MIL, the Symphony, and CFT reviewed it and agreed to accept its figure of $93,540 as the fair market value of each one per cent interest in MIL to be redeemed. This in turn produced slightly increased redemption prices of $140,041 for the Symphony's 1.497 per cent interest (originally $134,000) and $338,967 for CFT's 3.624 per cent interest (originally $324,283). None of the opinions filed in this case contends that the Taxpayers had anything at all to do with MIL's exercise of the call right or with the redemption prices paid by MIL to the Symphony and CFT for these interests. [12]

## B. Taxation of 1996 Gifts

In 1997, the Taxpayers timely filed federal gift tax returns for calendar year 1996, reflecting the aggregate values of their January 12, 1996 gifts as $2,475,896.40 and $2,482,604.84, respectively. These taxable values (before adjustment for annual exclusions of $60,000 per Taxpayer and charitable contribution deductions of $209,173 per Taxpayer) were determined on the basis of the Frazier appraisal for that date, in which the gross fair market value of the respective gifts were reduced by, among other things, (1) total federal gift taxes payable by the Taxpayers on their gifts to the non-exempt donees, payment of which was assumed by these donees, and (2) the actuarially determined present value of the non-exempt donees' contractually assumed liability for the additional estate taxes that would be incurred pursuant to the current version of § 2035 and the date-of-gift estate tax rates, should the triggering condition subsequent of the subject Tax Code provision occur, i.e., should either or both of the Taxpayers fail to survive for three years after January 12, 1996. [13]

## C. Deficiency

The Commissioner of Internal Revenue (the "Commissioner") issued deficiency notices on Taxpayers' 1996 gift taxes in amounts of $2,053,525 and $2,047,903, respectively. These amounts resulted from the Commissioner's proposed increases in the values of taxable gifts for 1996 of $3,740,904 and $3,730,439, respectively. The Commissioner based these asserted increases on his contentions that the Taxpayers had (1) understated the fair market value of the donated interests in MIL, and (2) erred in discounting the fair market value of those interests by the mortality-based, actuarially calculated present value of the non-exempt donees' assumed obligations for additional estate taxes under § 2035. The Commissioner's fair market value of a one-percent interest in MIL was $171,749, almost double the Taxpayers' one-percent figure of $89,505.

## D. Proceedings

Shortly after these notices of deficiency were issued, the Taxpayers filed a petition in the Tax Court contesting the Commissioner's proposed deficiencies. The case was tried several months later before Judge Maurice B. Foley, largely on a joint stipulation of facts filed on the day of trial. The principal contested matters were those raised by the Commissioner in his deficiency notices: (1) the values of the Taxpayers' interest in MIL given under the dollar-value formula clause to the exempt and non-exempt donees on January 12, 1996, and (2) the propriety of discounting the gross fair market value of the gifts to the nonexempt donees on the basis of the actuarially determined negative present value of these donees' assumed liability for additional estate taxes of the Taxpayer or Taxpayers who might die within three years following the gifts. In their joint stipulations, the parties agreed that the Commissioner had the burden of proof pursuant to § 7491. The Majority expressly accepted that

evidentiary standard. [14] Commissioner's attack was grounded in the equitable doctrines of form-over-substance and violation-of-public-policy. The Commissioner did not advance an argument about the way that the Assignment Agreement should be interpreted or about the role of the Confirmation Agreement, if any, in determining fair market value. Rather, he asked the court to disregard the plain wording of the Assignment Agreement, as well as the undisputed facts of the relationships among the parties and their actions vis-à-vis one another — actions both taken and not taken — and to decide the case on one or both of these doctrinaire principles. [15] Judge Foley determined the outcome of the case on the stipulated evidentiary standard, holding that the Commissioner had failed to meet his burden of proof on any contested issue of fact or law and therefore could not prevail.

Approximately two years after that trial, the Acting Chief Judge of the Tax Court issued an unusual order that resulted in a proceeding that resembles an en banc rehearing. In essence, the case was taken away from Judge Foley retroactively and reassigned to Judge James S. Halpern who, on the same day, filed an opinion on behalf of the Majority. He was joined by seven other Tax Court judges, including the Acting Chief Judge. The Majority disagreed with Judge Foley's original opinion, which had turned on the Commissioner's failure to meet his burden of proof, and held instead for the Commissioner.

The Majority's holdings for the Commissioner were not, however, based on any of the overarching equitable doctrines that the Commissioner had advanced at trial. Instead, the Majority crafted its own interpretation of the Assignment Agreement and gave controlling effect to the post-gift Confirmation Agreement, all based entirely on a theory that the Commissioner had never espoused. At the core of the novel methodology thus conceived and implemented, sua sponte, by the Majority is the consistently rejected concept of postponed determination of the taxable value of a completed gift — postponed here until, two months after the Taxpayers gifts were completed, the donees decided among themselves (with neither actual nor implied participation of or suasion by the donors) how they would equate the dollars-worth of interest in MIL given to them on January 12, 1996, with percentages of interests in MIL decided two months later by the donees in the Confirmation Agreement. Stated differently, the Majority in essence suspended the valuation date of the property that the Taxpayers donated in January until the date in March on which the disparate donees acted, post hoc, to agree among themselves on the Class B limited partnership percentages that each would accept as equivalents of the dollar values irrevocably and unconditionally given by the Taxpayers months earlier. As shall be seen, we hold that the Majority's unique methodology violated the immutable maxim that post-gift occurrences do not affect, and may not be considered in, the appraisal and valuation processes.

The Taxpayers timely filed their notice of appeal.

# II. Analysis

## A. Standard of Review

The complex appellate review required in this gift tax case implicates (1) the interpretation and effect of contractual agreements, (2) the nature of property interests transferred by gift, (3) determination of the fair market value of such interests, and (4) special law rules governing that kind of evaluation exercise, including the types and percentages of discounts that may be applied. Thus, our standard of review here cannot be covered adequately by rotely reciting the ubiquitous single-sentence mantra that "we review factual determinations for clear error and legal determinations de novo." The particularized standard of review applicable in this case is accurately stated in the Taxpayers' appellate brief:

> An appellate court reviews a trial court's conclusions of law de novo and draws its own conclusions in place of those of the trial court. See American Home Assurance Co. v. Unitramp Ltd., 146 F.3d 311, 313 (5th Cir. 1998); Estate of Dunn v. Commissioner, 301 F.3d 339, 348 (5th Cir. 2002). Where a question of fact, such as valuation, requires legal conclusions, this Court reviews those underlying legal conclusions de novo. See Adams v. United States, 218 F.3d 383, 386 (5th Cir. 2000). The determination of the nature of the

property rights transferred is a question of state law that this Court reviews de novo. Id. (holding valuation subject to de novo review because "to arrive at a reasonable conclusion regarding the value of the [transferred] property ..., one must first determine the rights afforded to the owner [recipient] of such property by the applicable state law"). The [Majority Opinion's] failure to properly define the nature of the property rights transferred under the fixed-value formula in the Assignment Agreement and its [rejection of the Taxpayers' reduction of] the value of the interests transferred by the value of the [non-exempt] donees' contractual obligation to pay estate tax liability are questions of law subject to de novo review by this Court. Id. ("Inasmuch as the trial court's ultimate finding here is predicated on a legal conclusion regarding the rights inherent in the property, its valuation is subject to de novo review."). If this Court ignores the Assignment Agreement and determines that the interest to be valued are those set forth in the Confirmation Agreement, [16] the Tax Court's factual findings in the determination of the fair market value of the interests transferred are reviewed for clear error. See McInvale v. Commissioner, 936 F.2d 833, 836 (5th Cir. 1991).

## B. Burden of Proof

As we noted above, the parties stipulated (and the Tax Court accepted for purposes of this case) that, pursuant to § 7491, the Commissioner had the burden of proof. We review this case on appeal accordingly.

## C. Merits

### 1. Commissioner's Theory on Appeal.

At the outset, we reiterate that, although the Commissioner relied on several theories before the Tax Court, including doctrines of form-over-substance, violation-of-public policy, and, possibly, reasonable-probability-of-receipt, he has not advanced any of those theories on appeal. Accordingly, the Commissioner has waived them, [17] and has instead — not surprisingly — devoted his efforts on appeal solely to supporting the methodology and holdings of the Majority, as succinctly summarized in the Taxpayers' appellate brief:

> [t]he Majority held that (1) the interests transferred [by the Assignment Agreement of January 12, 1996] were assignee interests in [MIL]; (2) the Majority was not required to follow the terms of the Assignment Agreement in determining the fair market value of the interests in the partnership transferred by [the Taxpayers]; (3) the fair market value of the total interests transferred was $9,883,832, or $120,046 per 1% interest; (4) the value of the interests transferred should be based on the value determined by the Majority on a per unit basis times the percentage interests determined by the donees in a Confirmation Agreement reached by the donees two months after the gifts were made; and (5) the value of the [nonexempt] donees' contractual obligation to pay estate tax liability [under § 2035] could not be deducted in determining the value of [the Taxpayers'] gift. [18]

We address each of these holdings, albeit in a different sequence.

## 2. Nature of Rights Assigned

We gather that, in arguing at trial that some of the discounts employed by the Taxpayers' expert in valuing the interests donated were erroneous or inapplicable, the Commissioner specifically opposed a discount grounded in Mr. Frazier's contention that the Taxpayers had transferred less than full limited partners interests. The Commissioner does not, however, advance such a contention on appeal; so it too is waived, and we do not address that issue. [19] Our failure to address it should not, however, be viewed as either agreeing or disagreeing with the Majority's determination on this point. Rather, as

shall be shown, we have no need to reach it.

## 3. Fair Market Value of Interests in MIL Transferred by the Taxpayers

Contributing to the framework of our review in this section is the sometimes overlooked fact that this family-partnership case is not an estate tax case, but a gift tax case. Thus, the aggressive and sophisticated estate planning embodied here is not typical of the estate plans that have produced the vast majority of postmortem estate tax valuation cases. [20] Also helping to frame our review is the fact that this is not a run-of-the-mill fair market value gift tax case. Rather, as recognized by the Majority and by Judges Chiechi and Foley in dissent, the feature that most fractionated the Tax Court here is the Taxpayers' use of the dollar-formula, or "defined value," clause specified in the Assignment Agreement (the gift instrument, not either the original or the amended partnership agreement nor the Confirmation Agreement) to quantify the gifts to the various donees in dollars rather than in percentages, the latter being more commonly encountered in gifts and bequests that parcel out interests in such assets as corporate stock, partnerships, large tracts of land, and the like.

## a. Fair Market Value Must Be Determined on Date of Gift.

As detailed above, the Taxpayers irrevocably and gratuitously donated their entire remaining interests in MIL, constituting in the aggregate 82.33369836 per cent of that partnership. They did so on January 12, 1996 by executing the Assignment Agreement, which specified in dollars the quantum of all gifts of interests in MIL, except for the one to CFT which was a residual donation of whatever interest remained — if any — after all other gifts had been satisfied. Mr. Frazier appraised the fair market value of the interests given at $89,505 per one per cent ($7,369,215 for the Taxpayers' entire remaining interests in MIL), [21] and the Taxpayers filed gift tax returns calculated on these values.

The Commissioner's deficiency notices were based on a total value of the interest given, before adjustments, of $14,140,730, almost double the Frazier values used by the Taxpayers in preparing their gift tax returns. The Commissioner calculated his asserted total value by using $171,749 as the value of a one-percent interest in MIL.

The Commissioner introduced the expert opinion of Mukesh Bajaj, Ph.D. This expert's bottom line was that the fair market value of a one-percent interest in MIL on the date of the gift was $150,665.54, producing a total fair market value of $12,404,851.12. Thus, the Commissioner's own expert calculated the aggregate fair market value of all gifts to be $1,735,879 less than the value asserted by the Commissioner in his deficiency notices. Even though Dr. Bajaj disagreed with the values returned by the Taxpayers, he also disagreed substantially with the values asserted by the Commissioner in his delinquency notices. [22]

The Taxpayers adduced the testimony of Mr. Frazier and the documentary evidence he offered in support of his opinion, reiterating in detail his appraisal methodology and his conclusion that $89,505 was indeed the fair market value of one per cent of the interests donated by the Taxpayers as of January 12, 1996. The Taxpayers thereby provided the evidentiary underpinning of their proffered values.

Fast forward two years: Judge Foley's judgment for the Taxpayers based on the Commissioner's failure to meet his burden of proof is vacated and replaced by the Majority's. The Majority's opinion substantially treats neither the nature of the Commissioner's burden of proof nor whether he met it. Instead, the Majority confects its own methodology grounded in significant part in the donees' post-gift Confirmation Agreement. The Majority first proceeds independently to appraise the donated property, eventually reaching a value precisely halfway between those of Mr. Frazier and Dr. Bajaj. [23] As we hereafter hold, as a matter of law, that the methodology employed by the Majority in determining the taxable and non-taxable values of the various donations constitutes legal error, the results of the Majority's independent appraisal of the donated interests in MIL and their values for gift tax purposes become irrelevant to the amount of the gift taxes owed by the Taxpayers. [24]

## b. Re-Allocating Values of Gifts Based on Post-Gift Acts of Donees.

Under the instant circumstances, the ultimate-valuation "fact" is at most a mixed question of fact and law, and thus a legal conclusion. [25] Particularly when, as here, the determination of the fair market value for gift tax purposes requires legal conclusions, our review is de novo. [26] Indeed, it is settled in this circuit and others that a trial court's methodology in resolving fact questions is a legal issue and thus reviewable de novo on appeal. [27]

The Majority's key legal error was its confecting sua sponte its own methodology for determining the taxable or deductible values of each donee's gift valuing for tax purposes here. This core flaw in the Majority's inventive methodology was its violation of the long-prohibited practice of relying on post-gift events. [28] Specifically, the Majority used the after-the-fact Confirmation Agreement to mutate the Assignment Agreement's dollar-value gifts into percentage interests in MIL. It is clear beyond cavil that the Majority should have stopped with the Assignment Agreement's plain wording. By not doing so, however, and instead continuing on to the post-gift Confirmation Agreement's intra-donee concurrence on the equivalency of dollars to percentage of interests in MIL, the Majority violated the firmly-established maxim that a gift is valued as of the date that it is complete; the flip side of that maxim is that subsequent occurrences are off limits. [29]

In this respect, we cannot improve on the opening sentence of Judge Foley's dissent:

> Undaunted by the facts, well-established legal precedent, and respondent's failure to present sufficient evidence to establish his determinations, the majority allow their olfaction to displace sound legal reasoning and adherence to the rule of law. [30]

Judge Foley's "facts" are those stipulated and those adduced (especially the experts' testimony) before him as the lone trial judge, including the absence of any probative evidence of collusion, side deals, understandings, expectations, or anything other than arms-length, unconditional completed gifts by the Taxpayers on January 12, 1996, and arm's-length conversions of dollars into percentages by the donees alone in March. Judge Foley's "well-established legal precedent" includes, without limitation, constant jurisprudence that has established the immutable rule that, for inter vivos gifts and post-mortem bequests or inheritances alike, fair market value is determined, snapshotlike, on the day that the donor completes that gift (or the date of death or alternative valuation date in the case of a testamentary or intestate transfer). [31] And, Judge Foley's use of "olfaction" is an obvious, collegially correct synonym for the less-elegant vernacular term, "smell test," commonly used to identify a decision made not on the basis of relevant facts and applicable law, but on the decision maker's "gut" feelings or intuition. The particular olfaction here is the anathema that Judge Swift identifies pejoratively in his concurring opinion as "the sophistication of the tax planning before us." [32] The Majority's election to rule on the basis of this olfaction is likewise criticized by Judge Laro, dissenting in part, as the

Majority Appl[ying] Its Own Approach:

> To reach the result that the majority desires, the majority decides this case on the basis of a novel approach neither advanced nor briefed by either party .... [33]

Judge Foley also disagrees with the Majority — and rightly so, we conclude — for basing its holding on an interpretation of the Assignment Agreement and an application of the Confirmation Agreement that the Commissioner never raised. To this criticism we add that the Majority not only made a contractual interpretation of the Assignment Agreement that rests in part on the non sequitur that it uses the term "fair market value" without including the modifying language "as finally determined for tax purposes," [34] but also indicated a palpable hostility to the dollar formula of the defined value clause in that donation agreement. This is exacerbated by the Majority's lip service to, but ultimate disregard of, the immutable principal that value of a gift must be determined as of the date of the gift. The Majority

violates this doctrine when it relies in principal part on the post-gift actions of the donees in their March 1996 execution of the Confirmation Agreement. Judge Foley correctly notes that the Majority erred in conducting

> [A] tortured analysis of the [A]ssignment [A]greement that is, ostensibly, justification for shifting the determination of transfer tax consequences from the date of the transfer [January 12, 1996]...to March 1996 (i.e., the date of the [C]onfirmation [A]greement). The majority's analysis of the [A]ssignment [A]greement requires that [Taxpayers] use the Court's valuation to determine the [dollar] value of the transferred interests, but the donees' appraiser's valuation to determine the [percentages of] interests transferred to the charitable organizations. There is no factual, legal, or logical basis for this conclusion. [35]

We obviously agree with Judge Foley's unchallenged baselines that the gift was complete on January 12, 1996, and that the courts and the parties alike are governed by § 2512(a). We thus agree as well that the Majority reversibly erred when, "in determining the charitable deduction, the majority rely on the [C]onfirmation [A]greement without regard to the fact that [the Taxpayers] were not parties to this agreement, and that this agreement was executed by the donees more than 2 months after the transfer." [36] In taking issue with the Majority on this point, Judge Foley cogently points out that "[t]he Majority appear to assert, without any authority, that [the Taxpayers'] charitable deduction cannot be determined unless the gifted interest is expressed in terms of a percentage or a fractional share." [37] As implied, the Majority created a valuation methodology out of the whole cloth. We too are convinced that "[r]egardless of how the transferred interest was described, it had an ascertainable value" on the date of the gift. [38] That value cannot, of course, be varied by the subsequent acts of the donees in executing the Confirmation Agreement. Consequently, the values ascribed by the Majority, being derived from its use of its own imaginative but flawed methodology, may not be used in any way in the calculation of the Taxpayers' gift tax liability.

In the end, whether the controlling values of the donated interests in MIL on the date of the gifts are those set forth in the Assignment Agreement based on Mr. Frazier's appraisal of $89,505 per one per cent or those reached by the Majority before it invoked the Confirmation Agreement (or even those used by the Commissioner in the deficiency notices or those reached by the Commissioner's expert witness for that matter), have no practical effect on the amount of gift taxes owed here. Nevertheless, given the Majority's non-erroneous rejection of the Commissioner's experts's values and, as we shall show, its own legal error, not applying a discount to account for the present negative value of the non-exempt donees' assumed liability for § 2035 estate taxes (even before the Majority translated the defined value clause's dollars into percentages by use of the Confirmation Agreement), the fair market values applicable in this case are, by a process of elimination, those determined by the Frazier report and used by the Taxpayers in preparing their gift tax returns for 1996. In sum, we hold that the Majority erred as a matter of law. Accordingly, the taxable values used by the Taxpayers in preparing their gift tax returns must stand, subject only to the question of their having been arrived at, in part, by applying the actuarially determined present value of the non-exempt donees' assumed responsibility for payment of estate taxes, if any, under § 2035. We address that issue now.

## 4. Effect on Present Fair Market Values of Potential Estate Taxes Under § 2035

Taxes paid by a non-exempt donee on the value of property gratuitously transferred reduces the taxable value of such gift. [39] In calculating the taxable value of their 1996 gifts, the Taxpayers employed a variation on the venerable "net gift" theme for reducing that taxable value. They did so in calculating not only the amounts of correct gift taxes assumed by the non-exempt donees, but also in calculating the mortality-driven discount that a willing buyer would require to account for additional estate taxes that these donees would have to pay, pursuant to § 2035, if the Taxpayers or either of them should die within three years following the gift. The Majority held for the Commissioner, who contended that this particular factor is "too" speculative to be recognized in calculating the net gift. It appears that the dissenters and concurrers would have agreed with the Majority on this point. We,

however, disagree with the Majority and therefore reverse its ruling on this issue too.

There is nothing speculative about the date-of-gift fact that if either or both Taxpayers were to die within three years following the gift (as did Mr. McCord), the non-exempt donees would have been (and, coincidently, were) legally bound to pay the additional estate tax that could result from the provisions of § 2035. It is axiomatic contract law that a present obligation may be, and frequently is, performable at a future date. It is also axiomatic that responsibility for the future performance of such a present obligation may be either firmly fixed or conditional, i.e., either absolute or contingent on the occurrence of a future event, a "condition subsequent." And, it is axiomatic that any conditional liability for the future performance of a present obligation is — to a greater or lesser degree — "speculative." The issue here, though, is not whether § 2035's condition subsequent is speculative vel non, but whether it is too speculative to be applicable, a very elastic yardstick indeed.

Conditions subsequent come in a variety of flavors: A future event that is absolutely certain to occur, such as the passage of time; a future event, like the act of a third party that is not absolutely certain to occur, but nevertheless may be a "more ... certain prophec[y]" [40]; a possible, but low-odds, future event, such as the reversion of an interest in property if the unmarried and childless life tenant not only survives the transferor, but herself bears children who live to the age of majority and at least one of whom survives the transferor, as in Robinette v. Helvering, [41] undeniably a "less ... certain prophec[y] of the future." [42] And there are all degrees and shades of certainty along the "speculative" continuum, from absolute certainty to essentially total impossibility.

The issue presented here regarding the degree of certainty of the assumed obligation under § 2035, is a legal one (which we review de novo) To what conditions subsequent are the exempt donees' assumed § 2035 obligations subject, and thus "speculative"?; and, in combination, do these conditions subsequent's respective degrees of uncertainty make the contingent obligation in question too speculative to be credited for purposes of valuing the gift to the non-exempt donee? The judicial determination of how much is too much is a subjective one; yet it remains a mixed question of law and ultimate fact, to be reviewed de novo on the basis of an analysis of all the relevant and material discrete facts. Here, the discrete facts are not in dispute; only the extent to which, together, they make the probability of the occurrence of § 2035's condition subsequent too speculative to credit.

Putting ourselves in the shoes of the ubiquitous "willing buyer," we must first identify each factor that, by future change, could affect the likelihood that the non-exempt donees' will eventually have to pay the additional § 2035 estate tax. After that, we must identify which of those factors a willing buyer would (and we, as a matter of law, must) take into consideration in deciding whether it is too speculative for him to insist on its being used in reaching a price that the seller is willing to accept. It is in this context that we must make subjective determinations as to (1) where, on that continuum between absolute certainty and virtual uncertainty the non-exempt donees' contractually assumed responsibility for § 2035 estate taxes falls, and then (2) whether it is so speculative that our willing buyer would not insist on its being taken into consideration as a discount that a willing seller must accept.

Those donees' future performance of their present § 2035 obligation was subject to a number of factors and conditions at the time in January 1996 that the gifts were made. And, some of these factors are not totally predictable or quantifiable:

((1)) The amount of gift taxes owed by the Taxpayers for these gifts.
((2)) Whether there would be an estate tax or essentially identical death-related transfer tax in existence at the time of the death(s) of a Taxpayer or Taxpayers.
((3)) Whether the amount of gift taxes on the 1996 gifts would be taxable under § 2035, or some similar successor I.R.C. section, in the estate of a Taxpayer who dies within three years following the gift.
((4)) If such an estate tax would exist at the future death of a Taxpayer and, under it, the amount of the 1996 gift taxes are subjected to the marginal estate tax rate by § 2035 or any successor provision, will that rate be greater than, less than, or the same as the rate that was in

effect on January 12, 1996.

((5)) If § 2035 or its equivalent is in effect at the death or deaths of the Taxpayers, will it still be conditioned on survivorship for three years after the 1996 gifts, and if so, will the period of survivorship be the same, shorter, or longer than three years.

((6)) Whether the interest rate that a willing buyer and willing seller of the transferred partnership interests would agree to use in discounting their price to account for the negative value of the seller's potential obligation under § 2035 would be the same rate of interest as it was on the date of the gifts.

((7)) What would be the additional discount in value for the § 2035 obligation, based on actuarial odds that the measuring life would exceed the three-year survivorship trigger that automatically terminates the § 2035 obligation.

We consider each of these factors in turn.

Regarding the continued existence of (1) the estate tax law in its date-of-gift form and content, including § 2035, and (2) the estate tax rates in their date-of-gift percentages, this and other courts have repeatedly held that potential future changes in, or the continued existence of, the federal income tax law in general and of the capital gains tax in particular, are not contingencies that a willing buyer would take into consideration. [43] For purposes of our willing buyer/willing seller analysis, we perceive no distinguishable difference between the nature of the capital gains tax and its rates on the one hand and the nature of the estate tax and its rates on the other hand. Rates and particular features of both the capital gains tax and the estate tax have changed and likely will continue to change with irregular frequency; likewise, despite considerable and repeated outcries and many aborted attempts, neither tax has been repealed. Even though the final amount owed by the Taxpayer as gift tax on their January 1996 gifts to non-exempt donees has yet to be finally determined (depending, as it does, on the final results of this case), we are satisfied that the transfer tax law and its rates that were in effect when the gifts were made are the ones that a willing buyer would insist on applying in determining whether to insist on, and calculate, a discount for § 2035 estate tax liability.

The same is true for the interest rate at which a willing buyer would discount the § 2035 obligation to determine its present value. The rate of interest is not, however, a matter of speculation. § 7520 dictates precisely the rate of interest to be applied; and here, it is the rate that was applicable on the date of the gift. That date is, after all, the date on which our mythical willing buyer is deemed to have made his offer and had it accepted. The interest tables promulgated by the government bind the Commissioner and the Taxpayers alike.

This leaves for our examination only § 2035's condition subsequent — the ipso facto three-year expiration of liability for additional estate tax if the Taxpayer in question lives that long after making the gift. We must decide whether, in combination with the other above-identified factors, § 2035's three-year repose pushes the obligation assumed by the non-exempt donees beyond the point on the "speculative" continuum at which this concededly uncertain factor becomes too speculative. Even though neither we nor the Tax Court has addressed this precise question before, [44] we conclude on plenary review that it does not.

First, the Commissioner has never contended that Mr. Frazier's arithmetic in calculating the net taxable value of the January 1996 gifts was erroneous; only that, inter alia, no discount should have been taken for the § 2035 factor. Neither did the Commissioner dispute that, if legally applicable, the estate and gift tax laws and rates then in existence were those that were applied; nor that the correct interest rate for the present-value discount was used; [45] nor that the ages of the Taxpayers or the actuarially determined mortality factors for the Taxpayers at those ages were correct. [46] Again, then, the only legal question that remains unanswered in our de novo review is: Was the limitation of three years on the Taxpayers' exposure to the additional estate taxes imposed by § 2035 (which the non-exempt donees assumed), when viewed in pari materia with all other relevant factors and circumstances, too speculative to be included when Mr. Frazier calculated the net taxable value of those 1996 gifts? We answer this question in the negative, because we are convinced as a matter of law that a willing buyer would insist on the willing seller's recognition that — like the possibility that the applicable tax law, tax

rates, interest rates, and actuarially determined life expectancies of the Taxpayer could change or be eliminated in the ensuing three years — the effect of the three-year exposure to § 2035 estate taxes was sufficiently determinable as of the date of the gifts to be taken into account. [47] And, after all, it is the willing buyer/willing seller test that we are bound to apply. [48]

## III. Conclusion

For the foregoing reasons, we reverse the rulings and judgment of the Tax Court as embodied in the Majority's opinion. Accordingly, we hold that (1) given the Majority's reversible errors in evaluating the donated interest and using them in calculating gift taxes by (a) employing the Confirmation Agreement in its own calculations and (b) rejecting the § 2035 estate tax liability to discount the appraised value, the taxable value of the interests in MIL given by the Taxpayers to the Sons and the GST Trusts is not those determined by the Tax Court but are those determined and used by the Taxpayers, viz., $6,910,932.52; (2) the Taxpayers are entitled to a charitable deduction for the interests in MIL transferred to CFT under the Assignment Agreement in the amount of $324,345.16, being the base fair market value as determined by Mr. Frazier ($7,369,277.67), less the amounts given to the non-exempt donees ($6,910,932.51) and less the amount given to the Symphony ($134,000); (3) the January 12, 1996 taxable values of the interests in MIL given to the non-exempt donees were properly determined by applying, among other discounts, the actuarially determined date-of-gift present "value" of the obligation assumed by these donees to pay § 2035 estate taxes; and (4) the resulting fair market value of all interests transferred by the Taxpayers under the Assignment Agreement on January 12, 1996, were, respectively, $2,475,896.40 and $2,482,604.82; after annual exclusions and charitable contribution deductions, $2,206,724 and $2,213,432, respectively, as taxable gifts.

Accordingly, we reverse the holding of the Tax Court, and we remand this case to that court for entry of judgment for the Petitioners, consistent with this opinion, including, without limitation, assessment of all costs to the Respondent.

REVERSED and REMANDED for entry of consistent judgment.

---

1

McCord v. Commissioner, 120 T.C. 358 (2003) (Halpern, J., joined by Wells, Cohen, Swift, Gerber, Colvin, Gale, and Thornton, JJ. Separate opinions were filed by (1) Swift, J., concurring, (2) Chiechi, J., joined by Foley, J., concurring in part and dissenting in part, (3) Foley, J., joined by Chiechi, J., concurring in part and dissenting in part, and (4) Laro, J., joined by Vasquez, J., dissenting.)

---

2

Charles T. McCord, Jr., and Mary S. McCord were husband and wife. Mr. McCord died in August, 2001, while this matter was pending in the Tax Court, and his Succession, represented by two of the Taxpayers' four sons as testamentary co-executors, was substituted for the decedent as a petitioner-appellant.

---

3

Such potential § 2035 estate tax liability was expressly assumed pro rata by the non-exempt donees as conditions to their entitlement to the subject gifts. None disputes that the taxable values of the gifts made to the non-exempt donees were properly reduced by the gift taxes incurred by the Taxpayers, responsibility for which was also assumed by these donees.

---

4

The Taxpayers' contributions to MIL for their Class A limited partners interests and the Sons' contributions for their general partners interests were made in cash. The values of the in-kind interests

in business and investment assets contributed to MIL in exchange for Class B limited partners interest were based on appraisals by William H. Frazier, a principal in the Houston-based valuation and consulting firm of Howard, Frazier, Barker, Elliott, Inc. Mr. Frazier's testimony was submitted in the trial of this case as an expert witness on behalf of the Taxpayers.

5

---

A class A limited partners interest does not carry with it a "Percentage Interest" in MIL (as that term is defined in the Partnership Agreement).

6

---

McCord, 120 T.C. at 362–63.

8

---

Treas. Reg. § 25.2512-1

9

---

§ 2035(b) specified that if a taxpayer were to die within three years following the date of the gifts, an amount equal to the gift taxes paid on such gifts would be deemed included in his or her gross estates and subjected to federal estate tax.

10

---

The Commissioner's appellate brief uses the term "called for" in reference to the post-gift acts of the donees under the Confirmation Agreement, as though the Assignment Agreement required these acts. It does no such thing; it leaves everything post-gift to the independent discretion of each donee.

11

---

The lone exception is a gratuitous generalization in a footnote of the Majority opinion, in reference to the Confirmation Agreement, to which the Taxpayers were not parties. McCord, 120 T.C. at 373 n.9 (stating that "it is against the economic interest of a charitable organization to look a gift horse in the mouth.").

12

---

See id. at 365 n.2 ("[P]etitioners were not involved in the allocation of the gifted interest among the assignees pursuant to the Confirmation Agreement.").

13

---

On their gift tax returns, the Taxpayers claimed annual exclusions totaling $60,000 on gifts to non-charitable donees and charitable deductions on gifts to the charitable donees in the amount of $209,173, reducing their respective amounts of taxable gifts to $2,206,724 and $2,213,432.

14

---

McCord, 120 T.C. at 369; see also U.S.T.C. R. Prac. & P. 142(a)(1)–(2).

15

It appears that the Commissioner also referenced the doctrine of reasonable-probability-of-receipt in a brief to the Tax Court, but he did not pursue or rely on it there or here.

16
_____

Emphasis ours.

17
_____

See Webb v. Investacorp, Inc., 89 F.3d 252, 257 n.2 (5th Cir. 1996)(holding that a party who fails to raise an issue in its brief waives the right to appellate review of that issue); see also Fed.R.App.P. 28 (a)(9)(A) (stating that appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

18
_____

Emphasis ours.

19
_____

See supra note 17 and accompanying text.

20
_____

Cf., e.g., Strangi v. Commissioner, 417 F.3d 468 (5th Cir. 2005).

21
_____

The Commissioner's appellate brief uses $7,369,303.

22
_____

This exemplifies a practice of the IRS that we see with disturbingly increased frequency, e.g., a grossly exaggerated amount asserted in a notice of deficiency. See, e.g., Caracci v. Commissioner, --- F.3d --- (5th Cir. 2006), 2006 WL 1892600.

23
_____

The value of $120,046 per one-percent interest produced by the Majority has a de minimis $39 variance from the arithmetically precise median between the dueling experts' respective one-percent values: (a) $89,505 plus $150,665 = $240,170; (b) $240,170 divided by 2 = $120,085; (c) $120,085 minus $120,046 = $39. Thus the Majority split this almost $10 million baby precisely halfway between the experts' respective values.

24
_____

Even though (1) Judge Swift concurred, (2) Judges Chiechi and Foley separately concurred in part and dissented in part (and joined each others opinions), and (3) Judge Laro dissented and was joined by Judge Vasquez, none of these five judges advocated substantially different valuation methodologies than the one employed by the Majority to determine date-of-gift values before the Majority proceeded to apply the provisions of the Confirmation Agreement to such values so as to re-allocate percentage interests. This we assume is because they (at least the four judges who totally or partially dissented) would never have reached the question of fair market value, because they were either sustaining the Taxpayers for the Commissioner's failure to meet his burden of proof, or sustaining the Commissioner

under one or more of the equitable doctrines he advanced at trial but has abandoned on appeal.

25

---

See Estate of Dunn v. Commissioner, 301 F.3d 339, 357 (5th Cir. 2002).

26

---

See Adams v. United States, 218 F.3d 383, 386 (5th Cir. 2000).

27

---

See, e.g., Estate of Dunn, 301 F.3d at 357; Adams, 218 F.3d at 386 ("Inasmuch as the trial court's ultimate finding here is predicated on a legal conclusion regarding the rights inherent in the property, its valuation is subject to de novo review.").

28

---

See, e.g., Ithaca Trust Co. v. United States, 279 U.S. 151 (1929); Estate of McMorris v. Commissioner, 243 F.3d 1254 (10th Cir. 2001); Estate of Smith v. Commissioner, 198 F.3d 515, 522 (5th Cir. 1999)("[T]he value of the thing to be taxed must be estimated as of the time when the act is done.")(quoting Ithaca Trust Co., 279 U.S. at 155)(emphasis in original).

29

---

See supra note 28.

30

---

McCord, 120 T.C. at 416 (Foley, J., concurring in part and dissenting in part) (emphasis added).

31

---

See, e.g., Estate of Smith, 198 F.3d at 522.

32

---

McCord, 120 T.C. at 404 (Swift, J., concurring).

33

---

Id. at 425 (Laro, J., dissenting) (emphasis in original).

34

---

Id. at 418–419 (Foley, J., concurring in part and dissenting in part) ("There is no material difference between fair market value "determined under Federal gift tax valuation principles" and fair market value "as finally determined for Federal gift tax purposes."").

35

---

Id. at 416–17 (emphasis added).

---

36

Id. at 417–18 (citing Ithaca Trust Co., 279 U.S. at 155; Estate of McMorris, 243 F.3d at 1259–60; Estate of Smith, 198 F.3d at 522; Propstra v. United States, 680 F.2d 1248, 1250–51 (9th Cir. 1982)).

37

Id. at 418.

38

Id.

39

See, e.g., Rev. Rul. 75-72, 1975-1 C.B. 310.

40

Ithaca Trust Co., 279 U.S. at 155.

41

318 U.S. 184 (1943).

42

Ithaca Trust Co., 279 U.S. at 155.

43

See, e.g., Estate of Dunn, 301 F.3d at 351; Estate of Jameson v. Commissioner, 77 T.C.M. (CCH) 1383 (1999), rev'd on other grounds, 267 F.3d 366 (5th Cir. 2001).

44

McCord, 120 T.C. at 401–02 (stating "[t]he specific question before us is whether to treat as part of the sale proceeds (consideration) received by each [Taxpayer] on the transfer of the gifted interest any amount on account of the [non-exempt donees'] obligation pursuant to the [A]ssignment [A]greement to pay the [§] 2035 tax that would be occasioned by the death of that [Taxpayer] within 3 years of the valuation date. We have not faced that specific question before.") (emphasis added).

45

I.R.C. § 7520.

46

Table 80CNSMT, in Treas. Reg. § 20.2031-7A(e)(4)(effective April 30, 1989 through May 1, 1999); see Ithaca Trust Co., 279 U.S. at 155 (stating that property interests that terminate automatically at the death of the lifetime owner "must be estimated by the mortality tables.").

47